NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 8

No. 2016-316

| | |
|---|---|
| Roy H.A. Watson III | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| The Village at Northshore I Association, Inc. | June Term, 2017 |

Helen M. Toor, J.

Brooks G. McArthur and David J. Williams of Jarvis, McArthur & Williams, Burlington, for
  Plaintiff-Appellant.

Christina A. Jensen of Lisman and Leckerling, P.C., Burlington, for Defendant-Appellee.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1. **EATON, J.** This appeal from cross-motions for summary judgment involves a long-standing dispute between a condominium unit owner, Roy H.A. Watson III, and the organization that manages his condominium, the Village at Northshore I Association (Association). The legal issues center around the application of two laws, the Condominium Ownership Act (COA) and the Common Interest Ownership Act (CIOA), to the Association's governing documents. The trial court ruled in favor of the Association and granted it declaratory judgment on all thirteen issues that are before this Court on appeal. As to nine of the thirteen issues, we affirm the trial court's judgment in favor of the Association. As to two issues, we reverse and enter declaratory judgment in favor of Watson. As to two other issues, we affirm the trial court's decision in favor of the Association in part and reverse and enter declaratory judgment in Watson's favor in part.

I. Facts

¶ 2.    The Association was created in 1986 by an original declaration document, the Declaration of Condominium of the Village at Northshore I (Original Declaration).  Physically, Northshore is a collection of 136 condominium units in twenty-five buildings.[1]  The units are a combination of two-story townhouse units and one-story garden homes.  Watson purchased his unit at Northshore in 1987, and his deed specifies that his ownership interest is in "an undivided interest in the Common Areas and facilities including the use of the garage(s) shown on said site plan as No. 132, all as set forth in the Declaration [dated February 21, 1986]."  The percentage of undivided interest in the common areas that each unit owns is specified in a "Schedule of Assigned Values, Common Element Ownership and Common Expense Liability" that is attached to the Original and Amended Declarations as Exhibit C.  Watson's unit, No. 132, has an assigned value of $90,000, and like the owners of all other units with that assigned value, Watson owns 0.6781% of the common elements and is liable for that percentage of the annual common element expenses; other units with higher assigned values own a correspondingly higher interest in the common elements, which correlates to a higher common expense liability.

¶ 3.    The Association itself is a nonprofit, nonstock organization incorporated under the laws of Vermont whose membership is limited to the owners of units at Northshore.  The Association is organized "for the purpose of administering and managing [Northshore] in accordance with the Declaration," and its responsibilities include holding, regulating, and managing portions of Northshore for all unit owners in common, setting and collecting annual dues, and providing voting rights for administration of Association affairs.  Each owner is automatically entitled to the benefits of membership in the Association, subject to rules adopted by the Board of Directors (Board).  Among the benefits of membership is a right to vote in Association affairs, with each unit being allocated one vote.  The Board is comprised of members

---

[1] Two of the units were combined physically, but they remain independent for governance purposes, including voting.

of the Association and is designated to act on behalf of the Association. Its powers include, among other things, proposing amendments to the Declaration, adopting and amending bylaws and rules, making contracts, improving and managing commonly owned property, and imposing and receiving payments and fees from unit owners. The Association, its members, and the Board are all governed by the terms of the Association's Declaration and Bylaws, as well as by overarching statutory provisions, and this appeal involves overlapping disagreements about those sources of law.

¶ 4. The first source of law is statutory. The Legislature enacted the COA, 27 V.S.A. Chapter 15, in 1968. By the terms of the Original Declaration that was in place in 1987 when Watson purchased his unit, the Association was subject to the COA: "[T]he [Association] hereby submits the Property to the provisions of Chapter 15 Title 27 of the Vermont Statutes Annotated, known as the Vermont Condominium Ownership Act." See 1967, No. 228 (Adj. Sess.), § 1; 27 V.S.A. § 1301. In 1998, however, Vermont adopted the CIOA, which went into effect on January 1, 1999. 1997, No. 104 (Adj. Sess.), §§ 3, 6. Some, but not all, sections of the CIOA applied retroactively to common interest communities that were created prior to January 1, 1999; other sections of the CIOA applied "only to events and circumstances occurring after December 31, 2011." 27A V.S.A. § 1-204(a)(1)-(2) (listing sections that apply to preexisting common interest communities). Accordingly, the sections listed in 27A V.S.A. § 1-204(a)(1) applied to the Association as soon as the CIOA went into effect in 1999, while the sections listed in § 1-204(a)(2) applied starting in January 2012. Any other aspect of the Declaration not covered by § 1-204(a)(2) continued to be subject to the COA. Additionally, the Association fully adopted the CIOA in 2012, so any amendments to the Declaration after 2012 were subject to the CIOA.

¶ 5. The central disagreement between the parties involves the Declaration and how it allocates ownership interest in the physical structures that make up Northshore, including privately owned areas and commonly owned areas, and the Declaration's amendment process. Between 1986 and 2012, the Association amended the Original Declaration multiple times, and in 2012, it

3

adopted and recorded a new declaration, the Amended Declaration, that completely replaced the Original Declaration. Both the Original and the Amended Declarations distinguish between units, common elements, and limited common elements, all of which have specific definitions. First, the Original Declaration defines "Common Area" or "Common Element" as "parts of the property as defined in the [COA]"[2] and "parts of the property other than the Units." Article III of the Declaration provides an exhaustive list of common elements: the property on which the units sit and shared property; all rights, easements, restrictions and agreements associated with that property; all portions of buildings in Northshore, except for units; and all improvements other than the units.

---

[2] The COA provides that "common areas and facilities" include, "unless otherwise provided in the declaration or lawful amendments thereto":

(A) Land on which the building or site is located;

(B) Foundations, columns, girders, beams, supports, main walls, roofs, halls, corridors, lobbies, stairs, stairways, fire escapes, and entrances and exits of the building;

(C) Basements, yards, gardens, private roads and streets, parking areas, and storage spaces;

(D) Premises for the lodging of janitors or persons in charge of the property;

(E) Installations of central services such as power, light, gas, hot and cold water, heating, refrigeration, air conditioning, sewage disposal, and incinerating;

(F) Elevators, tanks, pumps, motors, fans, compressors, ducts, and in general all apparatus and installations existing for common use;

(G) Such community and commercial facilities as may be provided for in the declaration; and

(H) All other parts of the property necessary or convenient to its existence, maintenance and safety, or normally in common use.

27 V.S.A. § 1302(6).

4

¶ 6.    Second, the Original Declaration defines "Limited Common Elements" as "those portions of the Common Elements reserved for the exclusive use of one or more, but less than all, of the Units." Article III clarifies that limited common elements include "[a]ny doorsteps, stoops, porches, decks, patios and all exterior doors and windows, equipment storage areas, closets or other fixtures or improvements designated to serve, attached to, or adjacent to a single Unit," as well as "garage spaces" depicted on a map that forms part of the Declaration. Finally, "Unit Estate" and "Unit" encompass "all the components of ownership held by an Owner, including the rights and interest of the Owner in and to the Unit and the rights of use and undivided interest in the Common Area." Additionally, the Declaration defines the boundaries of each unit as the bottom surface of the ceilings of the highest floor and the top surface of the subflooring on the first floor, plus the innermost surface of the walls. No unit sits above any other unit, meaning that the attic space over each unit is accessible only to that unit.

¶ 7.    Finally, in addition to statutory law and the Declaration, the Association and its members are subject to internal Bylaws and Rules. The original Bylaws were in place until 2012, when the Association voted to adopt a new Declaration and a new set of Bylaws. The Rules that were in effect when this litigation began were adopted on April 29, 2013, and were subsequently amended on September 25, 2013. The Bylaws and Rules that are the most relevant to the present appeal provide as follows. First, the Board is composed of five volunteer members elected by the Association and has always had the authority to establish rules and regulations regarding the use of common elements. Specifically, the original Bylaws place in the Board the responsibility for maintaining, repairing, and replacing the common elements. The Amended Declaration and Bylaws further clarify that the Board has the authority to adopt rules "that affect the use of or behavior in Units to . . . implement a provision of the Declaration." Rule 2.5.7 of the most recently amended rules requires that unit owners maintain a temperature monitor that is capable of alerting the Board or another designee of the Association any time the temperature in a unit drops below forty-five degrees.

5

¶ 8. Rule 6.1 provides that, for each violation found by the Board after notice and hearing of any Association rule or bylaw, the violator shall be fined fifty dollars, plus ten dollars per day if the violation is "of a continuing nature." Article VII of the amended Rules applies to over-the-air-reception devices and permits unit owners to install satellite dishes in accordance with the restrictions outlined in the rules. Rule 8.1 prohibits any "modification or addition to any unit" without prior written approval from the Board.

¶ 9. Additionally, the Declaration and Bylaws regulate the voting and amendment procedures applicable to the Board. Section 4.02 of the amended Bylaws outlines the requirements for Board meetings. The Board is required to hold an annual meeting at which: the president and treasurer must report on "the activities and financial condition of the Association"; the members must elect "one or more Directors in accordance with the requirements of these Bylaws"; and members must vote on other issues that are before the Board. The Board is required to provide notice to the members prior to any Board meeting and must hold a regular meeting no more than forty-five days following an annual meeting and at least once every four months. In addition, the Board has the power to hold executive sessions "from which others are excluded" by an affirmative vote of two-thirds of the Directors present at a Board meeting, at which the Board is authorized to discuss various limited matters that may require confidentiality, including legal matters. Finally, the Board has the power to amend the Declaration in accordance with the provisions outlined in the applicable statute.

## II. Procedural History

¶ 10. The present litigation began in August 2013, when Watson, without an attorney, filed a complaint for declaratory judgment. In October 2014, following the resolution of an appeal to this Court on a matter not presently relevant, Watson—with the assistance of counsel—filed an amended thirty-page complaint, again seeking only declaratory relief, that raised thirteen distinct issues. Those were captioned as follows:

(1) improper easements in VNS [Village at Northshore] amended and restated declaration; (2) improper rule mandating the use of temperature monitor devices; (3) required 48 hour notice and permission for members to comment at VNS Board meetings; (4) Association['s] failure to properly maintain the common element fence behind my unit; (5) Association['s] past and present ongoing illegal rules and policies regard[ing] satellite dish and antenna installations; (6) unit expansions; (7) illegal removal of "roof structures" from my allocation of limited common elements; (8) Association['s] failure to ensure the safety of unit #133; (9) failure of the VNS Board to record my garage transfer amendment; (10) garage definitions as pertaining to their allocation as limited common elements; (11) VNS Board and President Marmelstein wrongfully terminated me as VNS assistant secretary; (12) VNS Board of Directors improperly withheld Association records from me; and (13) the Association, through President Marmelstein and the Board of Directors, violated sections 10.01 and 9.01(c) of the VNS amended and restated declaration and did so in an arbitrary and capricious way.

¶ 11.  In January 2015, Watson requested subpoenas for the Association's former attorneys, seeking "documents . . . related to the drafting and preparation" of the Amended Declaration and Bylaws.  The trial court, citing three separate bases, quashed the subpoenas in April 2015.  Then, on June 9, 2015, the Association moved to dismiss, or in the alternative, for summary judgment on all thirteen issues.  On August 6, 2015, Watson moved to voluntarily withdraw four issues:  the Association's failure to ensure the safety of Unit 133; Watson's wrongful termination as the Board's assistant secretary; the Board's improper decision to withhold records from Watson; and the Association's alleged violation of sections 10.01 and 9.01(c) of the Amended Declaration.  In response, the Association moved to dismiss those issues with prejudice and order Watson to pay fees and costs.  The trial court, reasoning that the Association had invested time and money to investigate facts related to those four contentions, granted the Association's motion and dismissed those issues with prejudice, but declined to order fees and costs.

¶ 12.  The trial court ruled in favor of the Association on all the remaining claims.  First, it concluded that it lacked jurisdiction to decide the question of whether the Association's forty-eight-hour notice requirement violated Watson's rights because it found that Watson had only alleged a generalized grievance.  See infra, ¶¶ 66-67.  Next, it dismissed Watson's claim related to

7

his antenna based on federal law because, it reasoned, the federal rule that Watson cited did not create a private right of action. See infra, ¶¶ 39-41. The court then granted judgment in favor of the Association on all but two of the remaining issues, reasoning for each claim that the Association had complied with the applicable statutory framework, internal governing documents, and Vermont common law.

¶ 13. On two issues—one relating to the fence in Watson's yard and the other relating to the Association's refusal to record Watson's garage deed—the court determined that there were disputed issues of material fact. It held a trial on July 27, 2016, and ruled in favor of the Association on both issues, finding that the Association had fulfilled its obligation to repair the fence and that Watson had engaged in "intentionally oppositional behavior" with respect to the garage deed.

¶ 14. Watson timely appealed all thirteen issues to this Court on August 24, 2016. In November 2016, a single Justice of this Court granted Watson's motion to file an enlarged brief and printed case; the Association's motion for extended briefing was also granted in January 2017. Watson ultimately filed a ninety-six-page brief and a 1750-page printed case, and the Association filed a sixty-four-page reply brief and a thirty-three-page supplemental printed case.[3]

¶ 15. Watson's appeal requests declaratory relief for each of the thirteen issues. The "availability of declaratory relief turns on whether the plaintiff is suffering the threat of actual injury to a protected legal interest," and this Court has the authority to enter declaratory judgment

_____

[3] In its brief, the Association raised an additional preliminary issue, arguing that "Watson's entire Brief is inadequate for review" and should be dismissed because it does not comply with Vermont Rule of Appellate Procedure 28. Although we agree with the Association that Watson's brief does not comply, at a minimum, with Rule 28(a)(4)(B), and although the Association is correct that this Court may decline to consider noncompliant briefs, see, e.g., Johnson v. Johnson, 158 Vt. 160, 164 n.*, 605 A.2d 857, 860 n.* (1992), we nevertheless reach the merits of the claims in this case because of the importance of the issues, the number of parties affected, and the likelihood of ongoing litigation. However, we also note that when there is a request for extended briefing, the request comes with the expectation that any additional pages will be used judiciously so as not to place an excessive burden on the Court and opposing counsel. Here, the briefing fell short of that expectation.

when appropriate. See Dernier v. Mortg. Network, Inc., 2013 VT 96, ¶ 38, 195 Vt. 113, __ A.3d __ (quotation omitted); see also Cupola Golf Course, Inc. v. Dooley, 2006 VT 25, ¶ 10, 179 Vt. 427, __ A.3d __ (per curiam) (describing 12 V.S.A. § 4711 as giving courts authority to enter declaratory judgment "to adjudicate and define specific rights and liabilities"). We review the court's decisions on the availability of declaratory relief and summary judgment de novo. Summary judgment is appropriate only where there exists no disputed issue of material fact. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Gauthier v. Keurig Green Mountain, Inc., 2015 VT 108, ¶ 14, 200 Vt. 125, 129 A.3d 108 (quotation omitted). Although we view the record as a whole, "[i]n determining whether there is a genuine issue as to any material fact, we will accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." Id. (quotation omitted); Brod v. Agency of Nat. Res., 2007 VT 87, ¶ 2, 182 Vt. 234, 936 A.2d 1286 (explaining standard of review for dismissal of declaratory judgment claim). Additionally, we review the trial court's interpretations of the COA, CIOA, and the Association's governing documents de novo. See Madowitz v. Woods at Killington Owners' Ass'n, 2010 VT 37, ¶¶ 9-12, 188 Vt. 197, 6 A.3d 1117 (interpreting COA and homeowners' association's governing documents under de novo standard).

### III. Analysis of Issues

#### A. Issue One: Does the access easement in the Amended Declaration violate Watson's property rights?

¶ 16.     According to Watson, the Amended Declaration violates his rights under Vermont property law because it expanded the Association's easement to enter his unit for purposes beyond those authorized in the COA and the CIOA. Specifically, Watson argues that § 5.04(b) of the Amended Declaration unlawfully grants the Association the power to enter his unit to enforce compliance with the Association's rules and that that power is not authorized by the CIOA. The trial court, looking to the Original and Amended Declarations, ruled in favor of the Association

9

and issued a declaratory judgment that "[b]y accepting the deed to his unit, Watson accepted the terms of the covenants," including their duly enacted amendments. However, because we agree with Watson that the Amended Declaration purports to grant the Association powers beyond the scope of those authorized by the CIOA, we reverse on this issue and issue a declaratory judgment that the Association's entry easement permits access to homeowners' units only to the extent allowed by the CIOA—namely, to allow the association to carry out its duty to "maint[ain], repair and replace[]" common elements. 27A V.S.A. § 3-107(a).

¶ 17. Article V, § 5.04(b) of the Amended Declaration provides that the Board may "enter any Unit (a) from time to time at any time in the event of emergency or in order to accomplish emergency repairs; and (b) after prior notice, to determine compliance with this Declaration and Rules, to enforce such compliance and for any other lawful purpose." Additionally, Article VI, § 6.02(e) provides that specified members of the Board may, "during reasonable hours," enter any unit "to inspect it and any improvements in connection with an application [for construction] or to ensure compliance with the Board's action." In contrast, Article V(E) of the Original Declaration gave the Board the authority to "access across [each] Unit reasonably necessary" to provide "[m]aintenance, repair and replacement of the Common Elements."

¶ 18. The legal issue before this Court is whether these provisions of the Amended Declaration attempted to grant the Board more power than the Board can lawfully exercise under the initial Declaration or CIOA. The CIOA controls the contents of the Amended Declaration because the Legislature, in enacting the CIOA, decided that, apart from several exceptions not applicable here, "this title applies to all condominiums in this state after the effective date of this title." 27A V.S.A. § 1-201(a). Accordingly, we look to 27A V.S.A. § 3-107(a), the relevant portion of the CIOA, to determine if the Amended Declaration grants the Association rights not authorized by the CIOA.

¶ 19.   Section 3-107(a) provides that, in the interest of upkeeping a common interest community, "[e]ach unit owner shall provide to the association and the other unit owners, their agents or employees, access through his or her unit reasonably necessary" to allow the association to carry out its duty to "maint[ain], repair and replace[]" common elements.  27A V.S.A. § 3-107(a).  Thus, to the extent that the Amended Declaration grants the Association the authority to enter a unit in order to maintain, repair or replace common elements, the Amended Declaration is a valid exercise of the Association's power because the CIOA expressly contemplates that a condominium's governing organization will have that authority.  See id.

¶ 20.   However, the statute is silent on the question of what additional authority the Association may assert in terms of expanded access easements.  Where a statute "does not address" a legal issue and where the statute is not "clearly inconsistent with the common law" and does not "attempt[] to cover the entire subject matter," the common law controls.  Langle v. Kurkul, 146 Vt. 513, 516-17, 510 A.2d 1301, 1303 (1986) (holding that Vermont's Dram Shop Act, in providing cause of action in strict liability to third persons injured by inebriates, did not preempt common law cause of action in negligence); see also 1 V.S.A. § 271 (adopting common law where it "is not repugnant to the constitution or laws").  Here, the relevant common law is that applicable to access easements.  And as this Court has explained, a fundamental principle underlying the common law of access easements is that any expansion of an easement "must be generally of the type originally contemplated" and "must not materially burden the landowner beyond what was intended."  See Preseault v. City of Burlington, 2006 VT 63, ¶ 12, 180 Vt. 597, 908 A.2d 419 (mem.); see also Dernier v. Rutland Ry., Light & Power Co., 94 Vt. 187, 194, 110 A. 4, 7 (1920) ("The principle which underlies the use of all easements is that the owner thereof cannot materially increase the burden of it upon the servient estate, nor impose a new or additional burden thereon.").

¶ 21.   The CIOA—which, apart from 27A V.S.A. § 3-107(a), is silent on the question of access easements—does not "attempt to cover" the entire field of access easements.  See Langle, 146 Vt. at 516, 510 A.2d at 1303.  Nor is the CIOA, in its silence, "clearly inconsistent with the

11

common law." See id. Accordingly, the common law rule applies, and we must determine whether the Amended Declaration materially increased the scope of the Association's authority to access Watson's unit, thereby imposing on Watson an additional material burden.

¶ 22.    A comparison of the Original Declaration and the Amended Declaration makes clear that the Amended Declaration materially increased the Association's authority and therefore the burden on Watson's servient estate.  Under the Original Declaration, the Association was entitled to enter Watson's unit only as "reasonably necessary" to provide "[m]aintenance, repair and replacement of the Common Elements."  In contrast, the Amended Declaration gave the Association the authority to enter Watson's unit, "after prior notice, to determine compliance with this Declaration and Rules, to enforce such compliance and for any other lawful purpose," and "during reasonable hours," to enter his unit "to inspect it and any improvements in connection with an application [for construction] or to ensure compliance with the Board's action."

¶ 23.    The Amended Declaration imposes a material burden on Watson's estate by expanding the scope of the purposes for which the Association may enter Watson's unit. Specifically, the Amended Declaration purports to give the Association the authority to enter Watson's unit to determine compliance with the Declaration and Rules, to enforce compliance, and "for any . . . lawful purpose," in comparison to the limited authority that the Association had under the Original Declaration to enter his unit only to provide "[m]aintenance, repair and replacement of the Common Elements."  Determining and enforcing compliance with the Declaration and Rules were powers not given to the Board in the Original Declaration, to say nothing of entry for "any lawful purpose."  These new purposes for entry are a significant expansion of the original scope of the permission to enter a homeowner's unit to provide maintenance, repair, or replacement of the common elements.  The Amended Declaration sought to confer permission to enter for any lawful purpose and also included new purposes by authorizing entry to determine and enforce compliance with the Declaration and Rules.  The common law applies to the Association's ability to expand its rights under the access easement, and under the

12

common law, the Amended Declaration imposes a material burden on Watson's unit by virtue of the attempt to expand the scope of the access easement. Accordingly, to the extent that the Amended Declaration expands the Association's access beyond what is "reasonably necessary" for "[m]aintenance, repair and replacement of the Common Elements," we hold that Article V, § 5.04(b) and Article VI, § 6.02(e) of the Amended Declaration are void.

B. Issue Two: Did the Association have the authority to reclassify roof structures without Watson's consent?

¶ 24. According to Watson, the trial court erred when it issued a declaratory judgment in favor of the Association because the Association's Declaration, the CIOA and Vermont's common law all prohibit the Association from reallocating his interest in "roof structures" as a limited common element. This issue presents three subsidiary questions. First, what law applies to the Association's amendment procedure? Second, did the Association comply with the applicable amendment procedure when it enacted the Tenth Amendment reclassifying "roof structures" as limited common elements? And third, does any statutory or common law rule prohibit the Association from enacting the Tenth Amendment without Watson's consent?

¶ 25. The amendment procedure in the Original Declaration provides that the Declaration and Bylaws "may be amended only by the agreement of the owners of Units to which two-thirds (2/3rds) of the votes in the COA appertain." In 2008, the Association recorded an amendment to the Declaration, the Roof Structures Amendment, that redefined limited common elements as follows:

> Any doorsteps, stoops, porches, decks, patios and all exterior doors and windows, equipment storage areas, <u>attic spaces and roof structures located immediately above a Unit</u>, closets or other fixtures or improvements designated to serve, attached to, or adjacent to a single Unit, but located outside the Unit's boundaries, are Limited Common Elements allocated exclusively to that Unit.

(Underline indicates added text.) The parties do not dispute that the Association adopted the Roof Structures Amendment in accordance with the Original Declaration. Also in 2008, Watson

13

received permission from the Association to install a satellite dish on the chimney above his unit, and he installed the dish in 2009.

¶ 26.  Then, in 2010, the Association again voted to amend the definition of limited common elements and adopted the Tenth Amendment, which provides:

> Any doorsteps, stoops, porches, decks, patios and all exterior doors and windows, equipment storage areas, attic spaces <u>above a Unit and skylights above a Unit</u>, <s>and roof structures located immediately above a Unit,</s> closets or other fixtures or improvements designated to serve, attached to, or adjacent to a single Unit, but located outside the Unit's boundaries, are Limited Common Elements allocated exclusively to that Unit.  <u>Although skylights are Limited Common Elements, they are restricted in their use, to wit, no structures, including but not limited to over-the-air reception devices, shall be attached to a skylight.</u>

(Underline indicates added text; strikethrough indicates deleted text.)  Again, the parties do not dispute that the Association adopted the Tenth Amendment in accordance with the provisions of the Declaration that applied at the time.

¶ 27.  Instead, Watson argues that the Tenth Amendment violates his rights because he did not consent to the Amendment's removal of "roof structures" from the list of limited common elements.  Specifically, according to Watson, the CIOA, 27A V.S.A. § 1-206(a), controlled amendments to the Original Declaration because the CIOA gives preexisting communities the power to amend their declarations "to achieve any result permitted by this title, regardless of what applicable law provided before this title was enacted."  That, Watson reasons, means that the Association was bound by the CIOA when it amended the Declaration, and the CIOA prohibits allocations of property from common elements to anything other than common elements absent "the consent of the unit owners whose units are affected."  27A V.S.A. § 2-108(a).[4]  Because he did not consent to the Tenth Amendment, he argues that it is invalid and unenforceable and that

---

[4]  The precise nature of Watson's argument is not clear.  On the one hand, he appears to concede that the COA—and not the CIOA—applied to the Association when it enacted the Roof Structures Amendment and when it enacted the Tenth Amendment.  On the other hand, his argument proceeds to apply the CIOA, he offers no alternate argument under the COA, and his brief at times seems to urge this Court to apply the CIOA.

14

he retains an ownership interest in "roof structures" appurtenant to his unit as limited common elements. We disagree.

¶ 28. As we explained in ¶ 4, supra, 27A V.S.A. § 1-204(a) lists the sections of the CIOA that apply retroactively to common interest communities that, like the Association, predate Vermont's adoption of the CIOA. Section 1-206(a), the section upon which Watson relies, is not among the provisions listed in § 1-204(a). As such, it does not apply retroactively to the Association, and because the Association adopted the Tenth Amendment and the Roof Structures Amendment prior to 2012, when the Association adopted the CIOA in full, the provisions of the COA that govern an association's amendment process control our analysis. See 27A V.S.A. § 1-204(a) (noting that some listed provisions apply only "to events and circumstances occurring after December 31, 1998" and that some apply only to "events and circumstances occurring after December 31, 2011").

¶ 29. The COA requires only that an association's declaration include a "[d]escription of the limited common areas and facilities, if any, stating to which apartments or sites their use is reserved," 27 V.S.A. § 1311(5), and "[t]he method by which the declaration may be amended," 27 V.S.A. § 1311(11). The Original Declaration, in turn, contained a description of the limited common elements—which was later altered by the Roof Structures and Tenth Amendments—and provides that "the Declaration and Bylaws may be amended only by the agreement of the owners of Units to which two-thirds (2/3rds) of the votes in the COA appertain." Watson does not dispute that the Association adopted the Roof Structures and Tenth Amendments in accordance with that amendment requirement—agreement by two-thirds of the votes allocated to unit owners. We therefore agree with the Association that neither amendment violated the CIOA, which did not apply to the Association at the time of the amendments, or the COA, because the Association satisfied its requirement that the Declaration contain "[t]he method by which the declaration may be amended," 27 V.S.A. § 1311(11).

15

¶ 30. We next address Watson's argument that even if the Tenth Amendment did not violate any statutory provision, it is nevertheless invalid because it violates his rights under Vermont's common law. Specifically, Watson argues that the Roof Structures Amendment created a covenant, enforceable as a servitude, that could not be terminated without his express consent. To support this argument, he cites 27 V.S.A. § 1307 for the proposition that an "aggrieved apartment or siteowner" may maintain a suit against an association for "[f]ailure to comply with [the covenants, conditions and restrictions set forth in the declaration]." Additionally, he cites Khan v. Alpine Haven Property Owners' Ass'n, 2016 VT 101, ¶ 38, __ Vt. __, 153 A.3d 1218,[5] and Nahrstedt v. Lakeside Vill. Condo. Ass'n, 878 P.2d 1275 (Cal. 1994), arguing that under those cases, the Association, as a common interest community, is made up of "covenants and servitudes that create burdens and benefits between the unit owners" and that regardless of how the Association amended the Original Declaration, it could not restrict his ownership interest in "roof structures" without his consent.

¶ 31. The cases that Watson cites, however, stand for the opposite proposition—"anyone who buys a unit in a common interest development with knowledge of its owners association's discretionary power accepts 'the risk that the power may be used in a way that benefits the commonality but harms the individual.' " Nahrstedt, 878 P.2d at 1282 (quoting R. Natelson, Consent, Coercion, and "Reasonableness" in Private Law: The Special Case of the Property Owners Association, 51 Ohio. L.J. 41, 43 (1990)). And the statutory provision on which he relies applies to create a private right of action against an association where a unit owner—not the association—has violated an obligation created by the association's declaration or bylaws. See 27 V.S.A. § 1307 ("Failure to comply with [the bylaws, administrative rules, covenants, conditions and restrictions set forth in the declaration or in the deed] shall be grounds for an action to recover

_____

[5] Watson's brief references Khan by name but the citation is inaccurate and the language he attributes to Khan is in fact from Nahrstedt v. Lakeside Vill. Condo. Ass'n, 878 P.2d 1275 (Cal. 1994). We address the arguments that we understand him to be making.

sums due, for damages or injunctive relief or both maintainable <u>by the manager or boards of directors</u> on behalf of the association of owners or, in a proper case, <u>by an aggrieved apartment or site owner</u>." (emphasis added)). Accordingly, we are not persuaded by Watson's argument.

¶ 32. The question of whether an amended declaration that governs a common interest community creates restrictive covenants[6] that are enforceable against the Association is one of first impression for this Court.

> Covenants are "agreement[s] or promise[s] of two or more parties that something is done, will be done, or will not be done," and are characterized by the type of burden they impose: an affirmative covenant calls for the covenanter to perform an act, while a negative covenant requires the covenanter to refrain from performing one.

<u>Patch v. Springfield Sch. Dist.</u>, 2009 VT 117, ¶ 8, 187 Vt. 21, 989 A.2d 500 (alterations in original) (citations omitted). A deed covenant, the kind of covenant at issue here, controls the rights and obligations of common scheme participants, and we interpret such covenants "so as to give effect to the intention of the parties if it can be gathered from the language used when interpreted in connection with, and in reference to, the subject matter and purpose sought to be accomplished at the time the instrument was executed." See <u>McDonough v. W.W. Snow Const. Co.</u>, 131 Vt. 436, 441, 306 A.2d 119, 122 (1973). The restrictive deed covenant Watson seeks to enforce is one that grants him the exclusive use and control of "roof structures," including the skylights connected to his unit.

¶ 33. The law in other states generally accepts the principle that a common interest community's declaration creates enforceable restrictive covenants, but courts have only enforced those covenants in the context of an association attempting to hold a unit owner to a provision of

---

[6] We have sometimes used the terms "equitable servitude," "restrictive covenant," and "reciprocal covenant" interchangeably. See, e.g., <u>Madkour v. Zoltak</u>, 2007 VT 14, ¶ 21, 181 Vt. 347, 924 A.2d 11 (describing "equitable servitude" and "restrictive covenant" and using terms interchangeably). For the sake of clarity, we refer in this opinion only to restrictive covenants, which is in conformance with our more recent decisions. See <u>Patch v. Springfield Sch. Dist.</u>, 2009 VT 117, ¶ 19 n.5, 187 Vt. 21, 989 A.2d 500 (noting that Court has used three terms interchangeably and using term "restrictive covenant" only).

the declaration. See, e.g., <u>Nahrstedt</u>, 878 P.2d at 1281 (enforcing covenant against unit owner and noting that "restrictions on the use of property in any common interest development may limit activities conducted in the common areas as well as in the confines of the home itself" and "[c]ommonly, use restrictions preclude alteration of building exteriors, limit the number of persons that can occupy each unit, and place limitations on—or prohibit altogether—the keeping of pets"); <u>Sullivan v. O'Connor</u>, 961 N.E.2d 143, 152-53 (Mass. Ct. App. 2012) (enforcing implied covenant against unit owner where covenant imposed burden on owners to pay dues to association); <u>Armstrong v. Ledges Homeowners Ass'n</u>, 633 S.E.2d 78, 85-86 (N.C. 2006) (describing covenants and explaining that "common interest communities establish and maintain the character of a community, in part, by recording a declaration listing multiple covenants to which all community residents agree to abide" and describing association as body created "to enforce the declaration of covenants and manage land for the common benefit of all lot owners"). And this interpretation of the law is in line with an understanding of the role of an association, which we adopt, as the governing body charged with enforcing restrictive covenants; the benefits and burdens of the restrictive covenants memorialized in a declaration inure to and are imposed upon unit owners, not the association itself. Cf. <u>Armstrong</u>, 633 S.E.2d at 86 (describing association as body created "to enforce the declaration of covenants and manage land for the common benefit of all lot owners"). As such, we reject Watson's argument that the Association here had an obligation to obtain his express consent prior to altering his ownership interest in roof structures; Watson purchased his unit "with knowledge of [the Association's] discretionary power" and he therefore "accept[ed] the risk that the power may be used in a way that benefits the commonality but harms the individual." See <u>Nahrstedt</u>, 878 P.2d at 1282 (quotation omitted). The Association followed the legally mandated amendment procedure when it enacted the Roof Structures Amendment and later when it enacted the Tenth Amendment. The trial court's decision on this issue is affirmed.

C. Issue Three: Did the court erroneously grant summary judgment to the Association on Issue Two—Roof Structures—when it did not request that relief in its motion for summary judgment?

18

¶ 34.    Watson argues that the trial court erred by granting summary judgment to the Association on Issue Two—the question of whether the Tenth Amendment to the Amended Declaration violated Watson's rights—because the Association "fail[ed] to comply with [Vermont Rule of Civil Procedure] 56's procedural requirements." Specifically, according to Watson, the Association "gained an unfair advantage" by requesting summary judgment on this issue for the first time only after the trial court had denied Watson's motion for summary judgment, thereby denying Watson the opportunity to respond to the facts and legal arguments that formed the basis for the court's decision. We disagree.

¶ 35.    Vermont Rule of Civil Procedure 56(a) provides the two-step process by which a party may prevail on a motion for summary judgment: first, the movant must show that there is "no genuine dispute as to any material fact," and second, the movant must be "entitled to judgment as a matter of law." V.R.C.P. 56(a); see also Gore v. Green Mountain Lakes, Inc., 140 Vt. 262, 264, 438 A.2d 373, 374 (1981). Additionally, once one party has filed a motion for summary judgment, Rule 56(f), "Judgment Independent of the Motion," gives the court authority to "(1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." V.R.C.P. 56(f). Prior to taking one of these actions, the court must give the parties "notice and a reasonable time to respond." Id. As we have previously explained, where the only question before this Court is the application of law to the facts, "our review is de novo." In re Manosh, 2014 VT 95, ¶ 8 n.1, 197 Vt. 424, 108 A.3d 212.

¶ 36.    The trial court ordered the parties to file motions for summary judgment no later than November 1, 2015. The Association filed a motion requesting judgment as a matter of law or summary judgment on all of the claims Watson brought before the trial court on June 11, 2015. Watson does not dispute that the Association's motion was timely, nor does he dispute that he had adequate notice and an opportunity to respond to the motion. Rather, Watson appears to argue that

the Association was not entitled to summary judgment on Issue Two—whether the Tenth Amendment violated his property rights—because the Association did not request that relief in its first motion for summary judgment.[7]

¶ 37. Issue Two—whether the Tenth Amendment violated Watson's property rights—is a question of law that required the court below only to apply the law to the undisputed facts. See V.R.C.P. 56(a). Watson has not identified any material facts from the trial court's hearing with which he disagrees, nor has he identified any disputed material facts that the trial court erroneously failed to consider. Accordingly, for the purposes of this appeal, there are no disputed material facts. Cf. Gallipo v. City of Rutland, 2005 VT 83, ¶ 33, 178 Vt. 244, 882 A.2d 1177 (holding that trial court properly deemed as admitted facts in statement provided by defendant with summary judgment motion because trial court did not challenge them as required by Rule 56).

¶ 38. Thus, because there were no material facts at issue with respect to Issue Two, the court in this case had the authority to "consider summary judgment on its own," or grant summary judgment to either party on "grounds not raised by a party," so long as both sides had sufficient notice and time to respond. V.R.C.P. 56(f). Watson does not argue that he did not have notice or sufficient time to respond to the Association's first motion for summary judgment. Accordingly, this dispute falls squarely within the process outlined in Rule 56(f), and the trial court did not err when it granted summary judgment to the Association on a "ground[] not raised by [either] party." V.R.C.P. 56(f)(2). The trial court is affirmed on this issue.

D. Issue Four: Does Watson have a federal right to install an antenna on the chimney or roof of his unit pursuant to a rule promulgated by the Federal Communications Commission?

---

[7] Although Watson argues that he did not have notice or an opportunity to respond to the entry of judgment against him on Issue Two, the Association in fact did request judgment as a matter of law on this issue on the basis that the claim was time barred. Additionally, the Association later filed a motion for summary judgment on that issue, after the trial court denied Watson's motion for summary judgment on the same issue.

¶ 39. Watson argues that he is entitled to install an antenna on the "roof structures" of his unit because a rule that the Federal Communications Commission (FCC) promulgated—the Over-the-Air Reception Devices Rule (OTARD Rule)—prohibits the enforcement of

> [a]ny restriction, including but not limited to any . . . homeowners' association rule or similar restriction, on property within the exclusive use or control of the antenna user where the user has a direct or indirect ownership or leasehold interest in the property that impairs the installation, maintenance, or use of . . . [a]n antenna that is . . . [u]sed to receive direct broadcast satellite service, including direct-to-home satellite service, or to receive or transmit fixed wireless signals via satellite . . . .

47 C.F.R. § 1.4000. The trial court dismissed this issue without reaching the merits because it determined that it "[did] not have jurisdiction to decide this issue because Watson already petitioned the FCC to decide the matter." Citing two federal cases, the court reasoned that the OTARD Rule "does not create a private right of action between a condominium association and unit owner," and it therefore dismissed Watson's claim.

¶ 40. The cases that the trial court cited, however, do not answer the question of whether a Vermont trial court has jurisdiction to entertain a claim under the OTARD Rule. Rather, those cases deal only with the question of whether a federal court has federal subject matter jurisdiction—based on federal question jurisdiction—to infer a private right of action. See Scott v. Lantern Park Condo. Ass'n, No. 3:05CV1265AVC, 2006 WL 618108, at *4 (D. Conn. Mar. 9, 2006) (noting that " 'a regulation promulgated by an administrative agency such as the FCC cannot by itself, in the absence of congressional authorization, confer subject matter jurisdiction on federal courts,' " and concluding that OTARD Rule therefore "does not create a federal private right of action" (quoting Opera Plaza Residential Parcel v. Hoang (Opera Plaza II), 376 F.3d 831, 835 (9th Cir. 2004)). In fact, an entry order in one of the cases cited by the trial court (Opera Plaza I) explicitly acknowledges that "state courts have been the entities called upon to interpret [the OTARD Rule] in the course of adjudicating alleged breaches of homeowners' association covenants which restricted the installation of satellite receivers." Opera Plaza Residential Parcel

v. Hoang (Opera Plaza I), No. C 02-01084 WHA, 2002 WL 1787214, at *6 (N.D. Cal. July 22, 2002). Accordingly, the Northern District Court of California concluded that "when [the OTARD Rule] has been invoked as a defense, the instant case should have its primary state-law claims adjudicated before a state court." Id. We agree. The fact that Watson petitioned the FCC for a determination of the status of his federal rights does not preclude a Vermont court from reaching the merits of his claim, which ultimately hinge on the resolution of a state-law question: who has exclusive use or control over the roof structures? Accordingly, the trial court erred when it dismissed Watson's claim for lack of jurisdiction.

¶ 41. Nevertheless, Watson's argument fails on the merits. The answer to the question of whether Watson had a right under the OTARD Rule to install an antenna on the roof structures or chimney associated with his unit depends on how the roof structures and chimney are classified—as a common element or as a limited common element. This is because, under the definitions in the Original and Amended Declarations, Watson has exclusive use and control over limited common elements associated with his unit, but not over common elements. Thus, it follows that if the roof structures and chimney are limited common elements, the OTARD Rule bars the Association from enforcing its ban on satellite receivers, but if they are common elements, the OTARD Rule does not apply and the Association is free to enforce its ban. See Preemption of Local Zoning Regulation of Satellite Earth, 11 F.C.C. Rcd. 19276, 19311 (1996)) (concluding that OTARD Rule does not apply "with regard to the placement of antennas on common areas or rental properties, property not within the exclusive control of a person with an ownership interest, where a community association or landlord is legally responsible for maintenance and repair and can be liable for failure to perform its duties properly"); Holliday v. Crooked Creek Vills. Homeowners Ass'n, 759 N.E.2d 1088, 1093-95 (Ind. Ct. App. 2001) (affirming that, even where homeowners had favorable declaratory judgment from FCC, restrictions on homeowners' installation of satellite dishes did not violate OTARD rule when homeowners sought to install dishes on common elements); 2682 Kingsbridge Assocs., LLC v. Martinez, 782 N.Y.S.2d 496, 497-98 (N.Y. Sup. Ct.

22

2004) (per curiam) (affirming landlord's eviction of tenants for unauthorized installation of satellite dish on window and holding that OTARD rule did not prevent landlord from enforcing apartment rule because tenants did not have exclusive rights of use or control over window area); Daly v. River Oaks Place Council of Co-Owners, 59 S.W.3d 416, 419-20 (Tex. App. 2001) (affirming that homeowners' association that sued homeowner for breach of association's governing rules did not violate OTARD rule when it refused to permit homeowner to install satellite dish in common area). Because we concluded in Issue Two, ¶¶ 24-33, supra, that the Association properly reclassified roof structures and chimneys as common elements, Watson does not have exclusive use or control over those elements and the OTARD Rule does not bar the Association from enforcing its ban on satellite dishes.

E. Issue Five: Did the Association violate Watson's property rights under Vermont law when it authorized unit expansion into common elements or limited common elements?

¶ 42. This issue and the related arguments that Watson raises are the crux of this appeal. Watson argues that the Association's approval of requests by unit owners to expand their units into the attic space and into the air space above their units unlawfully altered his undivided interest in the common areas and facilities without his consent. The argument raises two subsidiary issues. First, did the Association's decision to formally classify attic space as a limited common element violate Watson's property rights? And second, did the Association's decision to grant requests of some unit owners to expand into the attic or air space alter the actual percentage interest in common areas that the Declaration allocated to each unit? These two issues depend on the context in which the instant dispute arose, and as such, we begin with the relevant facts.

¶ 43. In 1999, the Association's Board approved a plan for the owner of Unit 136 to expand into the attic space above the unit. At the time, the Declaration did not specifically address the designation of attic space as a common element or a limited common element. Nevertheless, between 1999 and 2008, the Board approved expansions in approximately eight additional units that took either of two forms, "lofts" or "dormers," neither of which changes the footprint of the

23

unit or is accessible to or from other units. Loft expansions involve removing roof trusses and expanding the ceiling space above a unit's master bedroom to create a cathedral ceiling in what was previously attic space. The expansion creates a new bedroom, adds an internal spiral staircase, and adds between two and six skylights to the roof of the lofted area. Dormer expansions require the removal of significant portions of a unit's roof and the construction of a new room in what was previously airspace above the unit. The new room is level with and accessible from the unit's second floor, and requires that the unit owner add a new roof with at least one skylight.

¶ 44.    The original Declaration, prior to the amendments, was silent on whether attic spaces and "roof structures" were common elements, limited common elements, or components of units. The only guidance it provided was in its definition of limited common elements as "[a]ny doorsteps, stoops, porches, decks, patios and all exterior doors and windows, equipment storage areas, closets or other fixtures or improvements designated to serve, attached to, or adjacent to a single Unit, but located outside the Unit's boundaries." In 2008, the Association enacted the Roof Structures Amendment, which added to the list of limited common elements "attic spaces and roof structures located immediately above a Unit." Supra, ¶ 25. Thus, as the trial court noted, loft expansions were still classified as limited common elements under the Amended Declaration.

¶ 45.    Additionally, neither the Original nor the Amended Declaration defines airspace, but both define common elements as every part of Northshore other than the units and their accompanying limited common elements.[8] This is relevant because although the trial court made a finding that "[t]he undisputed facts [ ] do not include evidence that the expanded units have increased in value generally," the court did not consider separately loft expansions—which impact attic space—and dormer expansions—which impact airspace. In reaching that finding, the court

---

[8]    The sole reference in the printed case to how Northshore classified airspace is in the minutes from a Board meeting on August 28, 2013. At that meeting, a member of the Board acknowledged that "[w]e don't often think of that as common property, but . . . the air above our units belongs to everybody," and explained that the Association's attorney had therefore advised them "that any increase up vertically is also considered grouping into common elements."

24

reasoned that because "the expanded living spaces are considered limited common elements, they are still owned in common by the unit owners even though each space is allocated for the use of only one unit—like the garages and decks at Northshore."

¶ 46. We begin our analysis with the first subsidiary question—did the Association violate Watson's property rights when it enacted the Roof Structures Amendment and formally classified attic space as a limited common element? The Association argues that it enacted the Roof Structures Amendment in accordance with the procedures outlined in the COA, the CIOA, and the Original and Amended Declarations, and that it is therefore enforceable without Watson's approval. Watson, on the other hand, argues that under the amendment requirements in the CIOA and the COA, the Association was required to obtain "unanimous approval of the condominium unit owners to alter boundaries between condominium units and the common elements."

¶ 47. Because the COA requires that the Declaration include a "[d]escription of the limited common areas and facilities, if any, stating to which apartments or sites their use is reserved" and a "[d]escription of the common areas and facilities," the Association could not alter the boundaries of the limited common elements or common elements without amending the Declaration. 27 V.S.A. § 1311(4), (5). As we explained in ¶ 29, supra, when the Association enacted the Roof Structures Amendment, and later the Tenth Amendment, the COA applied to its amendment procedure. And under the COA, all that was necessary for the Association to lawfully amend the Declaration was compliance with the amendment process outlined in the Declaration, namely, two-thirds approval from the voting shares. Supra, ¶ 29; see also 27 V.S.A. § 1311(11) (requiring declaration to describe "[t]he method by which the declaration may be amended"). Watson does not dispute that the Association complied with that voting requirement. Rather, he cites to a sequence of cases from other jurisdictions to support his position that the Association was required to obtain unanimous approval from the units before it approved any unit expansion. This line of argument relates to the second subsidiary question—did the Association alter the percentage interest allocated to Watson's unit when it approved either loft or dormer expansions?

25

¶ 48.    Watson first cites 27 V.S.A. § 1306(b) for the proposition that the "percentage of the undivided interest of each [unit] owner in the common areas and facilities as expressed in the declaration shall have a permanent character and shall not be altered without the consent of all of the [unit] owners expressed in an amended declaration duly recorded." 27 V.S.A. § 1306(b). According to Watson, when the Association allowed some unit owners to expand into their attic space, it altered the boundaries of those units and therefore altered his percentage of undivided interest without unanimous consent.

¶ 49.    The Original and Amended Declarations contain a "Schedule of Assigned Values and Percentage Interests of the Village at Northshore I," with the assigned value of each unit and its corresponding "Assigned Percentage of Common Interest per Unit." In both schedules, Watson's unit had an assigned percentage of common element interest of 0.6781%. As we explain in ¶ 2, supra, those percentage allocations correspond to Watson's share of common expenses and ownership interest in the Association's common elements. As such, Watson's interest in the common elements is relative and will only be affected by the activity of other unit owners if those unit owners, with or without the Association's permission, effect a change in ownership status of some common elements that is not available to other unit owners. In other words, Watson's percentage interest in the common elements changes only if other unit owners receive exclusive use and control over a portion of the common elements and only if Watson does not also receive exclusive use and control over an equal portion of the common elements.[9] Compare Newport Condo. Ass'n v. Concord Wis., Inc., 566 N.W.2d 775, 779 (Wis. Ct. App. 1996) (holding that

---

[9]  For example, Watson built a deck in his yard. The deck occupies space that was previously a limited common element—the yard—and the deck itself is classified as a limited common element because it is a portion of the common elements "reserved for the exclusive use of one or more, but less than all, of the Units," see supra, ¶ 6. When Watson built the deck, his property value may have increased, but his relative interest in the common elements did not change because any other unit owner possesses an equal interest in the limited common elements and could therefore build a deck in his or her yard. Thus, as the trial court noted, "[n]o unit owner's percentage of undivided interest is altered when a unit's deck is extended, or when a unit owner acquires the use of a second garage."

26

association's decision to amend declaration to classify veranda as limited common element, not common element, did not change percentage ownership because unit owners retained common ownership interest in element, even as unit owners "lost their unlimited use of the veranda") with Bogomolov v. Lake Villas Condo. Ass'n of Apartment Owners, 127 P.3d 762, 770-771 (Wash. Ct. App. 2006) (holding that conversion of common areas—shore lands and docks—to additional dock space for exclusive use of specific apartment owners required unanimous consent because conversion "would limit the use of what would otherwise be common area").

¶ 50. To support his argument that unit expansion alters his undivided interest in the common elements, Watson relies heavily on a sequence of cases from other jurisdictions, including Makeever v. Lyle, 609 P.2d 1084 (Ariz. Ct. App. 1980). Makeever involved a common interest community in which only four of the sixteen units had second stories. The community had a governing declaration and a set of bylaws that were silent on the question of what process the community had to invoke in order to convert a common element into a portion of a unit, and at the time, Arizona was subject to a statute similar to Vermont's COA. One of the unit owners wanted to build a second story on his single-story condominium. He interpreted the community's bylaws as requiring only the approval of a majority of the unit owners to convert a common area into a part of a unit, and he obtained the approval of ten of the sixteen unit owners before building a second story and a basement. Other unit owners sued, arguing that the construction "would constitute a wrongful appropriation or taking for his sole and exclusive use and control of cubic space belonging in common to all the apartment owners, and that such a taking could not be accomplished without the unanimous consent of all the unit owners." Id. at 1086. The court agreed with the objecting unit owners and held that the power of the board to "actually convert the common general elements to the exclusive and private use and control of one of the individual owners constitutes a taking of the other remaining individual owners' property which must be clearly given by the statutes, declaration of submission or bylaws before its existence will be recognized." Id. at 1089; see also Kaplan v. Boudreaux, 573 N.E.2d 495, 496 (Mass. 1991)

(holding that absent unanimous consent of all unit owners, condominium association could not grant exclusive use and control of common element—sidewalk—to one unit owner because transfer of interest "reduced [the plaintiff's] percentage interest in the common property"), superseded by statute, Mass. Gen. Laws ch. 183A, 5(b) (2015) (West 2017); Sisto v. Am. Condo. Ass'n, 68 A.3d 603, 612-14 (R.I. 2013) (holding that state's Condominium Ownership Act required unanimous consent before unit owner could expand his unit's footprint into common area and rejecting as "a legal fiction" association's argument that unit expansion only affected limited common elements); Bogomolov, 127 P.3d at 770-71 (holding that under terms of declaration, unanimous consent of all apartment owners was required to pass amendment that would permit association to construct dock and boat slips on common areas, and to lease boat slips exclusively for use of specific apartment owners).

¶ 51.    While we disagree with Watson's reasoning as it applies to loft expansions into attic space, we agree with Watson that the Association violated the terms of the Amended Declaration, COA, and CIOA when it authorized dormer expansions that impacted commonly owned airspace. The Original and Amended Declarations define "Limited Common Elements" as "those portions of the Common Elements reserved for the exclusive use of one or more, but less than all, of the Units," and "a portion of the Common Elements allocated . . . for the exclusive use of one or more but fewer than all of the Units." See supra, ¶ 6. Each unit has attic space, and each attic space is "accessible only to the unit below it." An expansion into the attic space from the unit immediately below therefore does not alter the footprint of the unit, and the Amended Declaration's description of the attic space as a limited common element "for the exclusive use of one or more unit" is not the sort of "legal fiction" described in Sisto. See Sisto, 68 A.3d at 612-14. Moreover, expansion into the attic space does not alter the allocation of percentage interest in common elements so long as all unit owners have the power to expand into their appurtenant attic space, even if expansion increases the value of a unit—as is the case here. After all, Watson's unit has attic space and he could therefore expand into that space if he so desired. The fact that an

28

expansion might impact his unit's sale price is immaterial; Watson could upgrade his kitchen and potentially increase his unit's sale price and that kind of alteration would not result in a corresponding increase in his unit's common interest percentage. Attic space, like decks, porches, patios, closets and "other fixtures or improvements designated to serve, attached to, or adjacent to a single Unit," is properly classified as a limited common element under the Roof Structures Amendment. See supra, ¶ 25. And as we explained in Issue Two, supra, ¶¶ 24-33, the Association complied with the relevant law when it enacted the Roof Structures Amendment. Accordingly, we affirm the trial court's decision on this issue with respect to loft expansions into attic space.

¶ 52. With respect to dormer expansions into commonly owned airspace, however, we disagree and reverse the trial court. By the terms of the Original and Amended Declarations and by the definitions in the COA and CIOA, airspace at Northshore is a common element. See supra, ¶ 5 (reciting definition of common elements as "parts of the property other than the Units"); 27 V.S.A. § 1302(6)(H) (including in definition of "common areas and facilities" "parts of the property necessary or convenient to its existence"); 27A V.S.A. § 1-103(4)(A) (defining "common elements" as "all portions of the common interest community other than the units").[10] Moreover, airspace—unlike attic space or a garage—is not appurtenant to any one unit, but is instead shared by all of the units in common, like a commonly owned pool area or playground. Accordingly, an allocation of a portion of the airspace to any individual unit results in a reallocation of that airspace from a common element to a part of a unit—regardless of how the Association classified the dormer expansions—and that reallocation requires a unanimous vote by the unit owners. See 27 V.S.A. § 1306(b) ("The percentage of the undivided interest of each apartment or site owner in the common areas and facilities as expressed in the declaration shall have a permanent character and shall not be altered without the consent of all of the apartment or site owners expressed in an

---

[10] The Amended Declaration adopts the CIOA's definition of common elements as "all portions of the Common Interest Community except the Units." Additionally, the Association apparently recognized that airspace was a common element. See supra, ¶ 45 n.8.

29

amended declaration duly recorded."); 27A V.S.A. § 2-117(d) ("Except to the extent expressly permitted or required by other provisions of this title, no amendment may . . . change the allocated interests of a unit . . . in the absence of unanimous consent of the unit owners.")[11]; see also Grey v. Coastal States Holding Co., 578 A.2d 1080, 1083-84 (Conn. App. Ct. 1990) (interpreting statute with language identical to Vermont statute and holding that "the right to use the air above [a unit] is a property interest" and concluding that "air space above the condominium units in this case is a common element," meaning that defendants violated statute and declaration); Carney v. Donley, 633 N.E.2d 1015, 1021-22 (Ill. App. Ct. 1994) (holding that because airspace was common element and "individual defendants' construction of the balcony extensions diminished the plaintiff's ownership rights" in those common elements, association could not approve balcony without unanimous consent from unit owners). Thus, the Association effected a change in Watson's percentage interest in the common elements when it authorized dormer expansions and it did so without unanimous approval of unit owners, as required by the COA. The dormer expansions were therefore unauthorized as a matter of law.

F. Issue Six: Did the Association violate Watson's rights when it authorized the removal of ceilings, joists, and roof trusses to enable unit expansion?

¶ 53.    The trial court treated this issue as a subsidiary issue of Issue Five and therefore did not engage in substantive analysis, other than to conclude that the Association was entitled to judgment as a matter of law for the same reasons it was entitled to judgment as a matter of law on Issue Five. We agree that this issue is subsidiary to Issue Five and therefore conclude that it is controlled by our resolution of Issue Five.

G. Issue Seven: Does the Association have an obligation to file Watson's amendment reallocating Unit 127's garage to Watson's unit?

---

[11]   We note that 27A V.S.A. § 2-112 now applies to any changes the Association might make to boundary expansion into the common elements.

¶ 54. Watson argues that the Association is required by law to file an amendment to the Declaration that records his purchase of a garage associated with Unit 127. The Association, on the other hand, argues that it cannot record Watson's proposed amendment because it contains an error in the chain of title. The court construed Watson's request as one for specific performance and concluded that because there were material facts in dispute with respect to this issue, it could not grant Watson relief. The court therefore held a trial and made the following findings.

¶ 55. Watson and his wife purchased from his neighbors the rights to use a garage associated with their unit for $15,000. Watson's lawyer prepared a document recording the transaction, as required by a 2006 amendment to the Declaration. The relevant portions of the 2006 Amendment provide:

> A garage space may only be reallocated by an amendment to said <u>Declaration</u> executed by the unit owners between or among whose units the reallocation is made. . . . The persons executing the amendment shall provide the recording fees and a copy of the amendment to the Association, which shall record it. The amendment shall be recorded in the names of the parties and The Village at Northshore I Association, Inc.

¶ 56. The document that Watson sought to record, however, had an error in the chain of title, and the Association declined to record it until Watson's attorney corrected the error. Watson conceded at the trial court and in his briefing before this Court that there is an error in the document he seeks to have the Association record. However, Watson argued before the trial court that the people from whom he purchased the garage interest "were both elderly and very ill," so "forcing them to travel to a bank for another closing would be cruel." The trial court found Watson's representations of the sellers not credible, and instead found that the refusal to correct the error "to be intentionally oppositional behavior by Watson." Watson now renews his argument that the Association is required by the language of the 2006 amendment to record the document, the error in chain of title notwithstanding.

¶ 57. A trial court's factual findings are entitled to great deference, and we will reverse a factual finding only if, excluding modifying evidence and viewing the record before us in the light

most favorable to the prevailing party, we can identify no credible evidence to support the finding. Benson v. Hodgdon, 2010 VT 11, ¶ 10, 187 Vt. 607, 992 A.2d 1053 (mem.). Watson's arguments to this Court are essentially a challenge to the trial court's finding that he was "intentionally oppositional" and a claim that any error in the chain of title was immaterial. However, giving the court's findings the deference to which they are entitled, we disagree.

¶ 58. "Because a declaration of condominium is in the nature of a contract, we look to the intent of the contracting parties, which we presume is reflected in the contract's language when that language is clear." Highridge Condo. Owners Ass'n v. Killington/Pico Ski Resort Partners, LLC, 2014 VT 120, ¶ 14, 198 Vt. 44, 111 A.3d 427 (quotation omitted). Watson and the Association, having entered into a contractual arrangement by virtue of their agreement to be bound by the Amended Declaration, owed each other a duty of good faith and fair dealing in the course of negotiations subject to their contract. See Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993) (explaining that "[a]n underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement" and "[t]he implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" (citation and quotations omitted)). Here, the court found that Watson was "intentionally oppositional" in his refusal to correct the error in the chain of title. That finding, which is supported by the record, is sufficient to establish that Watson violated his duty of good faith and fair dealing with the Association. Cf. Carmichael, 161 Vt. at 209, 635 A.2d at 1217 ("[B]ad faith inheres in harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract. Additionally, subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his [or her] conduct to be justified." (quotation omitted)). The Association's refusal to record a document that it knew to be inaccurate was

reasonable. To record the document would have created an unnecessary error in the land records that could potentially affect title. Watson could have complied with the Association's reasonable request to correct the error in the recording document, and his refusal to do so means that the Association never had a duty to record the garage purchase. The trial court is affirmed on this issue.

H. Issue Eight: Does the Association have an obligation to alter the fence behind Watson's unit?

¶ 59. Watson seeks a declaratory judgment that the Association has a legal obligation to repair the fence that runs behind his unit. Because there were disputed material facts that precluded the court from entering summary judgment with respect to this issue, the court held a trial and made the following findings. The fence behind Watson's unit separates his yard from the Burlington bike path. In 2008, Watson and several of his neighbors asked the Association to replace the fence and move it farther from their units and closer to the bike path. The unit owners did not ask the Association to repair the fence because they believed that it was beyond repair. The relevant Association committees considered the request and, after consulting with counsel and obtaining financial estimates, decided to repair the fence rather than to replace it. Based upon testimony of two Board members, the Association asserted that it repaired the fence in 2010 and again in September 2015.

¶ 60. Neither party disputes that the fence is a common element and that the Association is therefore responsible for its "maintenance, repair or replacement." See 27 V.S.A. § 1302(7)(B) (defining common expenses); 27A V.S.A. § 3-107(a) ("[T]he association shall be responsible for maintenance, repair and replacement of the common elements."). Rather, Watson argued at the trial court, and renews his argument on appeal, that the Association did not repair the fence until September 2015. The court, however, "found credible the evidence presented by the Association that repairs were made in 2010, and then again in 2015." Watson's argument is therefore a disagreement with the trial court's factfinding, and "[w]e reiterate that our role in reviewing findings of fact is not to reweigh evidence or make findings of credibility de novo." Mullin v.

33

Phelps, 162 Vt. 250, 261, 647 A.2d 714, 720 (1994).  We will uphold the trial court's findings unless they are clearly erroneous, id., and here, although the evidence was disputed and the court's factual findings are scant, there is no basis upon which we can conclude that the court's findings are clearly erroneous.  We therefore affirm the trial court on this issue.

I. Issue Nine: Can the Association require the use of temperature monitors in each unit?

¶ 61.    The Association first adopted a bylaw requiring temperature monitoring devices in 2005, after a burst pipe caused flooding that resulted in $80,144 damage and the Association's insurance carrier warned that it would not renew the Association's coverage.  Specifically, Association Bylaw § 2.5.7 requires unit owners, "[c]ontinuously and without interruption from October 1 to April 30 of each year," to "maintain a temperature monitor in good working order capable of notifying the management company . . . whenever the temperature within a unit falls below 45 degrees."  The bylaw also gives the Association, "[i]n the event of a heat emergency and in the absence of the owner," the authority to "take such reasonable action as is deemed appropriate including entry into the unit to verify the loss of heat and the actual temperature within the unit."  Watson argues that the Association cannot lawfully require unit owners to install temperature monitoring devices because the bylaw "creates a new condition of ownership" that is not expressly authorized in the Declaration and because the rule is unreasonable.  We disagree.

¶ 62.    The COA, 27 V.S.A. § 1319(10),[12] provides that the Association may adopt bylaws that impose "[s]uch restrictions on and requirements respecting the use and maintenance" of units and common areas as are necessary "to prevent unreasonable interference" with other units and "the common areas and facilities."  "Common areas and facilities," in turn, include "[i]nstallations

---

[12]  Watson's argument on this issue is based on the CIOA, while the Association argues that the COA applies because that was the law in effect in 2005 when the Association adopted the rules that Watson is now challenging.  We agree with the Association.  The portions of the CIOA on which Watson relies—27A V.S.A. § 3-120(f) and § 2-117(f)—are not listed in 27A V.S.A. § 1-204(a)(1) or (2) and therefore do not apply to common interest communities created in Vermont prior to January 1, 1999.  See 27A V.S.A. § 1-204(a)(1), (2).  Thus, the Association is correct that the controlling law with respect to the Association's authority to adopt rules that govern the "use and maintenance" of units and common areas is the COA.

of central services such as . . . hot and cold water," "in general all apparatus and installations existing for common use," and "[a]ll other parts of the property necessary or convenient to its existence, maintenance and safety, or normally in common use." 27 V.S.A. § 1302(6)(E), (F), (H). The question that we must answer, then, is whether the temperature monitor rule is a "requirement[] respecting the use and maintenance" of units necessary "to prevent unreasonable interference" with other units and common areas and facilities.

¶ 63. As an initial matter, we note that water pipes and the infrastructure that supports them qualify as "common areas" under the definitions in 27 V.S.A. § 1302(6). Additionally, the temperature monitor rule is, by its plain wording, clearly a "requirement[] respecting the use and maintenance" of units: the bylaw requires unit owners to use a temperature monitoring device in order to maintain a warm enough environment during the winter to prevent burst pipes. The only genuinely contested issue, then, is whether the rule is necessary "to prevent unreasonable interference" with other units and with common areas and facilities.

¶ 64. What constitutes an "unreasonable interference" depends on the context in which the interference arises, such that what is reasonable for homeowners in a rural community is not necessary the same as what is reasonable for condominium owners living in a common interest community. As other jurisdictions have noted, "subordination of individual property rights to the collective judgment of the owners association together with restrictions on the use of real property comprise the chief attributes of owning property in a common interest development." Nahrstedt, 878 P.2d at 1282; see also Hidden Harbour Estates, Inc. v. Norman, 309 So. 2d 180, 181-82 (Fla. Dist. Ct. App. 1975) (explaining principle "inherent" to condominium concept is that "to promote the health, happiness, and peace of mind of the majority of the unit owners . . . each unit owner must give up a certain degree of freedom of choice which he [or she] might otherwise enjoy in separate, privately owned property"). Our interpretation of the temperature monitor rule, thus, depends in part on the communal nature of ownership interests in a community like Northshore.

¶ 65.    The clear objective of the temperature monitor rule is to prevent the temperature inside privately-owned condominiums from dropping to a level at which water pipes—a common area as defined in the COA—may freeze and burst, causing damage to other units or common areas.  The fact that the Association adopted the monitor rule in response to burst pipes caused by freezing that resulted in significant damage to various units and to common areas and a warning from its insurance carrier that it may not continue coverage reinforces our conclusion that the bylaw is reasonable.  Additionally, the interference to unit owners from burst pipes takes more than one form; apart from the obvious physical intrusion of water, burst pipes caused the Association's insurance rates to increase, resulting in higher common fees to all unit owners. Although we acknowledge Watson's privacy concerns, we conclude that, given the nature of the common interest community of which he is a member, the monitor rule is necessary to prevent unreasonable interference and is therefore a valid exercise of the Association's powers under the COA.  The trial court's decision on this issue is affirmed.

### J. Issue Ten: Does the Association bylaw requiring members who wish to address the Board to give forty-eight hours' notice violate Vermont law?

¶ 66.    The trial court dismissed this issue on the basis that Watson failed to demonstrate that he had been harmed by the Association's forty-eight-hour rule and that there was therefore no justiciable controversy from which the court could issue a declaratory judgment.  As such, we begin our analysis of this issue with the applicable standard for declaratory relief.  Section 4711 of Title 12 grants trial courts the authority to enter declaratory judgment "to declare rights, status, and other legal relations whether or not further relief is or could be claimed."  12 V.S.A. § 4711. Vermont has adopted the federal case-or-controversy requirement for declaratory relief, which encompasses the related doctrines of standing, mootness, ripeness, and political question.  Dernier v. Mortgage Network, Inc., 2013 VT 96, ¶ 38, 195 Vt. 113, 87 A.3d 465.  Accordingly, "[t]he availability of declaratory relief turns on whether the plaintiff is suffering the threat of actual injury to a protected legal interest."  Town of Cavendish v. Vt. Pub. Power Supply Auth., 141 Vt. 144,

147, 446 A.2d 792, 794 (1982); see also Golden v. Zwickler, 394 U.S. 103, 108 (1969) ("[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quotation omitted)).

¶ 67.     Here, Association Bylaw § 6.06(f) [hereinafter, the forty-eight-hour rule] provides that "[a] Person desiring to address the Board of Directors shall give notice at least 48 hours prior to the Meeting; the President may waive this requirement for good cause shown."  Additionally, as the trial court explained, the parties do not dispute that Board meetings also include an "Open Forum" period during which unit owners may raise questions or concerns.[13]  Watson argues that the forty-eight-hour rule—which the Association does not dispute applies at Board meetings— unlawfully restricts his ability to participate in Board meetings under the CIOA.  Thus, the facts alleged show that "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Golden, 394 U.S. at 108 (quotation omitted).  We therefore turn to the specific legal controversy between the parties.

¶ 68.     27A V.S.A. § 3-108(b)(4), which applies to executive board meetings,[14] requires that the board provide "a reasonable opportunity for unit owners to comment regarding any matter

---

[13] The record is unclear whether the forty-eight-hour rule applied to the Open Forum period as well as to official Board meetings, and the parties appear to disagree on this point.  Regardless, because we are entering a declaratory judgment and our determination is therefore limited to what the law permits, the parties' disagreement on this issue has no bearing on our resolution of this issue.  Cf. Richards v. Town of Norwich, 169 Vt. 44, 47-48, 726 A.2d 81, 84-85 (describing declaratory judgment standard and interpreting scope of state law, despite parties' factual disagreement).

[14] The Association's brief to this Court and the trial court's opinion both appear to base their interpretation of the forty-eight-hour rule on 27A V.S.A. § 3-108(a)(5).  That provision of the CIOA, however, applies to meetings of unit owners, not to meetings of the executive board. Compare 27A V.S.A. § 3-108(a) ("The following requirements apply to unit owner meetings . . . ." (emphasis added)), with id. § 1-308(b) ("The following requirements apply to meetings of the executive board and committees of the association authorized to act for the association . . . ." (emphasis added)).  Because Watson's challenge relates to his ability to participate in board

affecting the common interest community and the association."[15]  The question that we must answer, then, is whether the forty-eight-hour rule and the Open Forum period constitute a "reasonable opportunity" for unit owners "to comment regarding any matter affecting the common interest community and the association."  Id.

¶ 69.  Watson argues that the forty-eight-hour rule violates the CIOA because it "is a form of prior restraint that is in common use by oppressive regimes and is the sharpest tool in their toolbox used to quell dissent."  He does not, however, dispute that the Board never denied him the right to speak at a Board meeting.  The Association, on the other hand, argues that the forty-eight-hour rule is legally permissible because "[t]he evidence before the trial court showed that no unit owner had ever been denied the right to address the Board," and the CIOA requires only that unit owners be given a reasonable—not unlimited—opportunity to comment.  We agree.

¶ 70.  The meaning of the phrase "reasonable opportunity" in the context of the CIOA is a matter of first impression.  As such, we turn to familiar tools of statutory interpretation.  "Our objective in construing a statute is to effectuate the Legislature's intent, and we look first to the statute's language."  In re Carroll, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990.  If the Legislature's intent is evident from the plain language of the statute, we will enforce that meaning, "but, if doubts exist, the real meaning and purpose of the Legislature is to be sought after and, if disclosed by a fair and reasonable construction, it is to be given effect."  Id.

¶ 71.  Here, the plain language of the statute reveals the Legislature's intent.  We must interpret the phrase "reasonable opportunity" in the context of the statute, and generally, what is

meetings, not in unit owner meetings, our analysis depends on the language in subsection (b), not subsection (a).

[15] The CIOA, not the COA, applies to this cause of action under 27A V.S.A. § 1-204(a)(2), which applies 27A V.S.A. § 3-108 to "a common interest community created in this state before January 1, 1999," and to "events and circumstances occurring after December 31, 2011."  In his complaint, Watson requested declaratory relief on this issue and indicated that his participation at Board hearings had been subjected to the forty-eight-hour rule at meetings that occurred after December 31, 2011.

reasonable "must be determined on a case-by-case basis." See Will v. Mill Condo. Owners' Ass'n, 2004 VT 22, ¶ 17, 176 Vt. 380, 848 A.2d 336. For example, in the context of court proceedings, a "reasonable opportunity to be heard" requires notice of the proceedings, the opportunity to examine witnesses and offer testimony, and to be represented by counsel. See In re Oliver, 333 U.S. 257, 273 (1948). And in the regulatory context, a reasonable opportunity to be heard encompasses notice and an impartial tribunal. See New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 107-08 (1978). Thus, to understand what "reasonable opportunity" entails in the context of the CIOA, we look to the statute.

¶ 72. Two things are clear from the wording of the CIOA. First, the Legislature sought to provide unit owners with procedural protections sufficient to ensure their access to board meetings and the substance of those meetings. See, e.g., 27A V.S.A. § 3-108(b)(1) (requiring that board meetings be "open to the unit owners except during executive sessions"); id. § 3-108(b)(5) (requiring that board provide unit owners with advance notice for nonemergency meetings); id. § 3-108(b)(6) ("If any materials are distributed to the executive board before the meeting, the executive board at the same time shall make copies of those materials reasonably available to unit owners . . . ."). Second, the Legislature sought to provide associations and governing boards with some measure of flexibility in order to ensure the orderly and efficient operation of board meetings. See, e.g., id. § 3-108(b)(5) (creating exception for notice requirement in event of emergency meetings); id. § 3-108(b)(7) (permitting board meetings by "telephonic, video, or other conferencing process" so long as notice and participation requirements for unit owners is satisfied); id. § 3-108(b)(9) ("Instead of meeting, the executive board may act by unanimous consent as documented in a record authenticated by all its members."); id. § 3-108(b)(10) ("Even if an action by the executive board is not in compliance with this section, it is valid unless set aside by a court.").

¶ 73. It is in the context of this balance between procedural protections for unit owners and flexibility and efficiency for board members that we must determine whether the forty-eight-

hour rule undermines a unit owner's "reasonable opportunity" to "comment regarding any matter." Watson does not argue that the rule deprives him of reasonable notice of Board meetings, nor that it undermines his ability to comment at those meetings. As such, we conclude that the forty-eight-hour rule, as applied to Board meetings, does not run afoul of the CIOA. Requiring forty-eight-hours' notice is a reasonable constraint on open participation at Board meetings, since it does not impair a unit owner's actual ability to be heard or give comment. Cf. In re Oliver, 333 U.S. at 273 (defining reasonable opportunity to be heard in court proceeding as involving notice, opportunity to offer testimony and examine witnesses, and opportunity to be represented by counsel). However, whatever the past practice has been with respect to requiring notice prior to participation in Open Forum periods, we now hold that, in the context of 27A V.S.A. § 3-108(b)(4), the forty-eight-hour rule cannot apply to Open Forum periods. This is because requiring forty-eight hours' notice before a unit owner may participate in the Open Forum does not strike the balance between process and efficiency that the statute contemplates. Rather, requiring forty-eight-hours' notice prior to an Open Forum period merely serves to limit the scope of issues discussed at the Board meeting, since the Board may not have time to address all of the issues that unit owners raise at the formal meeting. See 27A V.S.A. § 3-108(b)(4). The forty-eight-hour rule, § 6.06(f) of the Association's Bylaws, is therefore valid as it applies to formal Board meetings but invalid to the extent that the Association may attempt to enforce it in the Open Forum periods.

### K. Issue Eleven: Does the Amended Declaration's redefinition of garage spaces as limited common elements violate Watson's property rights under Vermont law?

¶ 74.    Prior to 2006, the Declaration included the following language: "The garage spaces depicted on Exhibit B shall be Limited Common Elements appurtenant to and for the exclusive use of the respective Units to which they are assigned." As the trial court explained, Exhibit B is an overhead, loosely scaled map of Northshore that depicts the footprints of the units, including the garages, and indicates unit boundaries and garage stall boundaries with geometric shapes. Then, in October 2006, the Association recorded an amendment to the Declaration that authorized

unit owners to "reallocate[] by an amendment" to the Declaration any garage spaces allocated to their units. As we explain at ¶¶ 54-58, supra, Watson purchased a garage space from another unit owner in 2011 and attempted to record an amendment reflecting that transfer, apparently in an effort to place satellite dishes on the roof of the garage. Then, in 2012, the Association amended the Declaration and completely redefined garage spaces in Article III, § 3.01(a) as follows:

> There are no Limited Common Elements appurtenant to the Units, except . . . (ii) the garage stalls (that is, the area within the walls, ceilings and floors of the garages) referred to on Exhibit B. . . . Each garage stall designated on Exhibit B or thereafter reassigned is appurtenant to and for the exclusive use of the respective Unit to which it is assigned. The garage stalls were originally numbered to correspond to the number of the Unit to which each was originally appurtenant.

Watson's argument before this Court is that the 2012 Amendment reallocated the walls and roof of the garages from limited common elements to regular common elements, thereby reducing a unit owner's interest in garage spaces first allocated to unit owners in the Original Declaration, in violation of Vermont law.

¶ 75. The first question that we must answer, thus, is whether the Original Declaration's plain language defined the walls and roof of garages as limited common elements. As the trial court noted, for Watson to succeed on this issue, we must determine that the Original Declaration allocated "the entire garage structure, including the roof, the attic, the interior walls and the floor" to each unit.

¶ 76. In interpreting a declaration, we employ tools of contract construction. See Madowitz v. Woods at Killington Owners' Ass'n, 2010 VT 37, ¶ 12, 188 Vt. 197, 6 A.3d 1117. Where the language of a declaration is unambiguous, we give it that meaning, and "[t]hough we consider an agreement as a whole when examining individual provisions, we will not insert vaguely implied conditions, particularly when those conditions are inconsistent with the express language of the agreement." Id. (quotation and alteration omitted). Here, we agree with the trial court that the language of the original declaration was clear: the drawing depicts all of Northshore's

41

buildings in the same two-dimensional manner, and the text of the declaration describes the allocated area as "space," which does not support Watson's argument that the exterior walls, roofs, and other structures are "allocated to VNS unit owners." Reading the Original and Amended Declarations in concert, it is clear that the Amended Declaration merely clarified the definition of "garage stalls" depicted in the drawing of Northshore and did not materially alter Watson's property interest. The walls and roofs of garages were never allocated to the unit owners, and the trial court's determination that Watson's allocation was unchanged, and that he was therefore not entitled to summary judgment on this issue, is affirmed.

L. Issue Twelve: Did the trial court abuse its discretion when it quashed subpoenas that Watson sought for documents related to the drafting of the Tenth Amendment?

¶ 77. On January 13, 2015, Watson requested that the court issue subpoenas for deposition and document production for five individuals or organizations who were the Association's current and former attorneys. The court granted his request for three of the five counsel. Of the three counsel for whom subpoenas issued, two moved to quash the subpoenas. The court granted both motions to quash for three reasons:

1. The lawyers represented the association, not the individual members.

2. The materials are privileged. Discussing the topic at meetings does not mean the privilege for the private communications, or work-product, is waived.

3. Failure to pay the subpoena fee voids the subpoena.

¶ 78. On appeal, Watson argues that the court erred in granting the motions to quash because he contends that the Association bore the burden of establishing that the documents were privileged and it failed to meet that burden. His brief to this Court does not address the trial court's other two reasons for quashing the subpoenas.

¶ 79. Vermont Rule of Civil Procedure 45(b)(1) provides that service of a subpoena requiring appearance of a person "shall be made by delivering a copy thereof to such person and, if the person's attendance is commanded, by tendering to that person the fees for one day's

attendance and the mileage allowed by law." This Court has not yet had opportunity to interpret the fee requirement of Rule 45. When interpreting and administering rules of civil procedure, our aim is to give the rules their plain meaning. See Nelson v. Russo, 2008 VT 66, ¶ 8, 184 Vt. 550, 956 A.2d 1117 (mem.).

¶ 80.    Rule 45(c) "gives the court to which the subpoena is returnable broad powers to issue protective orders and impose sanctions to assure that nonparties are protected against significant expense and other burdens." Reporter's Notes—1994 Amendment, V.R.C.P. 45. And as the Reporter's Notes emphasize, a primary objective of the 1994 amendment to Rule 45(c) was to "provide stronger protections for the rights of witnesses in light of the expanded scope of the rule." Id. Additionally, the language in the Vermont rule follows the language of Federal Rule of Civil Procedure 45(b)(1),[16] and case law interpreting the federal rule is therefore instructive here.

¶ 81.    The plain meaning of Rule 45(c)—specifically, the use of the word "shall"—indicates that a failure to provide the fee for one day's attendance and a mileage estimate voids an otherwise valid subpoena. See State v. Hemingway, 2014 VT 48, ¶ 11, 196 Vt. 441, 97 A.3d 465 ("Generally, the imperative 'shall' indicates that the provision is mandatory."). This reading of the rule is in accordance with how the federal courts have interpreted the nearly identical federal rule. See, e.g., CF & I Steel Corp. v. Mitsui & Co., 713 F.2d 494, 496 (9th Cir. 1983) (holding that "the plain meaning of [the subpoena fee rule] requires simultaneous tendering of witness fees and the reasonably estimated mileage allowed by law with service of a subpoena" and affirming trial court's quashing of subpoena for failure to tender required fees); see also In re Dennis, 330 F.3d 696, 704 (5th Cir. 2003) ("The conjunctive form of the rule indicates that proper service requires not only personal delivery of the subpoena, but also tendering of the witness fee and a reasonable mileage allowance."); Brown v. Hendler, No. 09 Civ. 4486(RLE), 2011 WL 321139,

---

[16]    Until 1991, the provision of the federal rules governing subpoena fees appeared in subsection 45(c). See Advisory Committee Notes—1991 Amendment, Subdivision (b), F.R.C.P. 45 ("Paragraph (b)(1) retains the text of the former subdivision (c) with minor changes.").

at *2 (S.D.N.Y. Jan. 31, 2011) (quashing subpoena where party seeking subpoena failed to tender travel and witness fees).

¶ 82. Watson does not challenge the trial court's finding that he failed to tender the witness fee required by Vermont Rule 45(c). Accordingly, the trial court did not err when it quashed the two subpoenas, and we need not address the other grounds upon which the trial court granted the Association's motions to quash. The ruling below is affirmed.

### M. Issue Thirteen: Did the trial court abuse its discretion when it dismissed with prejudice four issues that Watson voluntarily withdrew?

¶ 83. Watson's final argument is that the trial court abused its discretion by granting his request to withdraw four unlitigated issues because it converted his motion to dismiss into a dismissal with prejudice. Watson first filed his pro se complaint on October 21, 2014, and, after retaining counsel, moved to withdraw four issues from the complaint on August 6, 2015, when he filed a motion for summary judgment. By the time Watson filed his motion for summary judgment, nearly two months had passed after the Association filed its own motion for summary judgment. The Association requested that the court dismiss the issues with prejudice because it had "expended time and effort" in investigating and addressing the four issues in its motions to dismiss and for summary judgment. The court agreed. Looking to Vermont Rule of Civil Procedure 41(a)(2), which provides that dismissal may be "upon such terms and conditions as the court deems proper," the court reasoned that dismissal with prejudice was appropriate, given the timing of Watson's motion and the fact that Watson himself requested the dismissal.

¶ 84. On appeal, Watson argues that the court abused its discretion by dismissing the issues with prejudice because, he contends, he never conceded that he could not prove those claims. The Association, however, argues that the court's decision to dismiss the issues with prejudice was not an abuse of its discretion, regardless of whether Watson did or did not make any concessions, given the timing of Watson's motions. We agree.

¶ 85. Vermont Rule of Civil Procedure 41(a) outlines the effects of a party's request for voluntary dismissal. Specifically, the Rule provides that "an action may be dismissed by the plaintiff without order of the court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs." V.R.C.P. 41(a)(1)(i). Where, however, a plaintiff requests dismissal after the adverse party has answered or moved for summary judgment, an order of the court is required to dismiss the claim or action "upon such terms and conditions as the court deems proper." V.R.C.P. 41(a)(2). Additionally, "[u]nless otherwise specified in the order, a dismissal under this paragraph is without prejudice." Id.

¶ 86. This Court has yet to address the scope of the trial court's discretion when it determines that the appropriate resolution of a plaintiff's motion to dismiss is to dismiss the claim or claims with prejudice. Again, in interpreting the rules of civil procedure, our aim is to give the rules their plain meaning. See Nelson, 2008 VT 66, ¶ 8. Vermont Rule of Civil Procedure 41 parallels Federal Rule of Civil Procedure 41, and we have previously looked to federal case law for guidance in interpreting our Rule 41. See, e.g., Deutsche Bank v. Pinette, 2016 VT 71, ¶ 18, 202 Vt. 238, 149 A.3d 479 (interpreting Vermont Rule 41(b)(3) by reference to federal law). We note that Vermont Rule 41(a) is similar to Federal Rule 41(a), and we agree with the reasoning adopted by the federal courts that have interpreted that rule. Specifically, we agree that a dismissal with prejudice may be appropriate where the plaintiff requests dismissal after the deadlines identified in Rule 41(a)(1)(i) have passed and where the defendant has demonstrated that it will suffer clear legal prejudice as a result of continued litigation. See In re FEMA Trailer Formaldahyde Prods. Liab. Litig., 628 F.3d 157, 163 (5th Cir. 2010) (interpreting F.R.C.P. 41(a)(2) in context of voluntary dismissal that trial court converted to dismissal with prejudice, concluding that such conversion was not abuse of discretion where defendant would have suffered prejudice from "continuing costs of legal defense," wasted "investment in trial preparation," and delay in resolution of case); Elbaor v. Tripath Imaging, Inc., 279 F.3d 314, 317 (5th Cir. 2002)

(explaining that in the absence of abuse by the movant, motions for voluntary dismissal should be freely granted unless the non-moving party will suffer some plain legal prejudice other than the mere prospect of a second lawsuit.); see also Pontenberg v. Boston Sci. Corp., 252 F.3d 1253, 1255-56 (11th Cir. 2001) (reviewing trial court's federal Rule 41(a) decision for abuse of discretion and applying clear legal prejudice standard); Andes v. Versant Corp., 788 F.2d 1033, 1036 (4th Cir. 1986) (applying clear legal prejudice standard). That rule is appropriate in light of the underlying purpose of the Vermont and federal rules: "to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions." Elbaor, 279 F.3d at 317 (quotation omitted). As such, while motions for voluntary dismissal should be "freely granted," the trial court has discretion to convert such a motion into a dismissal with prejudice when the non-moving party has demonstrated that it will suffer some legal harm other than the prospect of subsequent litigation. Id. at 317-18.

¶ 87. Here, Watson filed his motion to dismiss nearly two months after the Association requested summary judgment, meaning that the court appropriately analyzed his motion to dismiss under Rule 41(a)(2). Additionally, the court's decision to convert Watson's motion to dismiss into a dismissal with prejudice was based on its observations about the prejudice that the Association would suffer from continued litigation: "The Association investigated facts related to each issue and expended time and effort in addressing each of the issues in its motions to dismiss and for summary judgment." Our review for an abuse of discretion is highly deferential, Weed v. Weed, 2008 VT 121, ¶ 16, 185 Vt. 83, 968 A.2d 310, and the court's finding that the Association would suffer a legal harm beyond the prospect of additional litigation justifies the court's decision to dismiss Watson's claims with prejudice. The trial court's decision on this issue is affirmed.

IV. Conclusion

¶ 88. In summary, we affirm the trial court on the following issues: Issue Two, changing roof structures from limited common elements to common elements; Issue Three, the grant of summary judgment on Issue Two; Issue Four, the inapplicability of the OTARD rule to this

46

litigation; Issue Five with respect to expansion into the attic space by lofted expansions; Issue Seven, the Association's refusal to file Watson's garage deed; Issue Eight, Watson's request for additional repairs to the fence in his yard; Issue Nine, temperature monitors; Issue Ten, the forty-eight-hour rule as it applies to other than the Open Forum portion of Board meetings; Issue Eleven, redefining garage spaces; Issue Twelve, the court's order quashing Watson's subpoenas; and Issue Thirteen, the court's order dismissing other four issues with prejudice. We reverse and enter declaratory judgment in favor of Watson on the following issues: Issue One, the access easement purported to grant the Association more power than it was authorized to assert under the statute; Issue Five with respect to expansion into the commonly owned air space by dormer expansions; and Issue Ten the forty-eight-hour rule does not apply to the Open Forum portion of Board meetings. On Issue Six, the removal of ceilings, joists, trusses, and other structural items, we remand to the trial court for additional fact-finding. Additionally, because Watson only requested declaratory judgment and has not sought any other form of relief in the present action, he is not entitled to any specific performance or monetary damages unless and until he pursues an enforcement action in the trial court and the trial court so orders.

Judgment is entered in Watson's favor on issues one, access easement; five and six, expansion into the common elements, but only with respect to dormer expansions; and ten, but only with respect to the forty-eight-hour rule's application to the Open Forum portion of Board meetings. In all other respects, the trial court is affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 89.   **ROBINSON, J., dissenting in part.**   I write separately to make three points. First and foremost, the majority's suggestion that the Association can enact virtually any amendment to the Declaration as long as it has a two-thirds majority in conformity with the requirements of the Declaration is inaccurate and dangerous. Second, the authority to amend the Declaration does not

include the authority to materially interfere with Watson's established property interest in the roof structure without his consent. And finally, the Association's position with respect to the attic spaces rests on an untenable fiction. Accordingly, although I concur in the bulk of the majority's thoughtful and comprehensive opinion, I dissent from the majority's analysis and conclusions with respect to Issue Two, ante, ¶¶ 24-33, and Issues Five and Six, ante, ¶¶ 42-53.

¶ 90. The condominium declaration does not authorize two-thirds of the unit owners[17] to amend the declaration in any way they choose, without limitation; some amendments can only be effected by unanimous consent or, at a minimum, by agreement of the unit owners whose property interests are affected. This foundational proposition is supported by the terms of the declaration itself, the applicable statute, broader principles of common interest ownership law, the more recently enacted Uniform Common Interest Ownership Act, and common sense.

¶ 91. The declaration expressly notes that the laws of Vermont or the declaration itself may provide different methods of amendment or may require a larger majority than the two-thirds margin needed for most amendments to the declaration:

> Except in cases for which the laws of Vermont or this Declaration provide different methods of amendment or require a larger majority, the Declaration and Bylaws may be amended only by the agreement of the owners of Units to which two-thirds (2/3rds) of the votes in the COA appertain.

So, for example, the declaration provides that, except as set forth as to the use of limited common elements, "the Common Elements shall remain undivided and shall be devoted to the common use and enjoyment of all Unit Owners." By its own terms, the declaration places the undivided status of the common elements beyond a non-unanimous supermajority's power to change. The language of the declaration does not purport to afford unlimited authority to unit owners to amend the declarations by a supermajority. In any given case, the question remains: do the laws of Vermont

---

[17] I acknowledge that this is an imprecise formulation of the voting requirement, which calls for the "agreement of the owners of Units to which two-thirds (2/3rds) of the votes in the COA appertain." Because nothing in my analysis turns on the precise way the two-thirds votes are tallied, I use the more simplified but concededly less precise formulation throughout.

or the declaration itself limit the ability of a two-thirds majority to pass the challenged declaration amendment?

¶ 92.   Likewise, the Vermont Condominium Ownership Act (COA), which applies pursuant to the terms of the declaration itself, makes certain declaration amendments off limits:

> (b) The percentage of the undivided interest of each apartment or site owner in the common areas and facilities as expressed in the declaration shall have a permanent character and shall not be altered without the consent of all of the apartment or site owners expressed in an amended declaration duly recorded.  The percentage of the undivided interest in the common areas and facilities shall not be separated from the apartment or site to which it appertains and shall run with the interest conveyed or encumbered even though not expressly mentioned or described.
>
> (c) Common areas and facilities shall remain undivided.  No apartment or site owner or any other person may bring any action for partition or division of any part thereof, unless the property has been removed from the provisions of this chapter as provided in sections 1316 and 1326 of this title.  Any covenant to the contrary shall be null and void.

27 V.S.A. § 1306.  Even if two-thirds of unit owners seek to amend the declaration to accomplish one of the prohibited purposes, they cannot do so.

¶ 93.   Broader principles of common interest ownership law likewise reinforce that there are limits on the ability of a less-than-unanimous majority of unit owners to change the governing covenants without the consent of all affected.  In reviewing the voting requirements for various types of amendments to declarations, the Restatement concludes that "[e]xcept as otherwise expressly authorized by the declaration," and with some other limited caveats not applicable here, "unanimous approval is required (a) to prohibit or materially restrict the use or occupancy of, or behavior within, individually owned lots or units, or (b) to change the basis for allocating voting rights or assessments among community members."  Restatement (Third) of Prop.: Servitudes § 6.10(3)(a)-(b) (2000) (emphasis added).  The commentary explains that the varying approval requirements for different kinds of declaration changes "are designed to address the tension between providing the flexibility required for long-term viability of the community and providing

49

safeguards for the reliance interests of those who find themselves in the minority." Id. § 6.10 cmt. a.

¶ 94. With respect to those amendments that typically require the consent of those affected, the Restatement explains, "Courts traditionally have protected common-interest community members from amendments that interfere with substantial reliance interests in maintaining the character of the community and amendments that unfairly shift burdens or benefits from one group of members to another." Id. cmt. f. The Restatement provides the following illustration:

> The declaration for Green Acres provides for amendment of the declaration by the affirmative vote of owners of two-thirds of the lots. Lots in Green Acres are restricted to residential use, except for parcels owned by the association, which are restricted to recreational use. Three lots at the entrance to the subdivision fronting on State Route 5 are acquired by a grocery-store developer, which seeks and obtains the consent of the owners of two-thirds of the lots to an amendment that permits the three lots to be used for retail-commercial purposes. The owners of lots nearest the proposed development all oppose the amendment. The conclusion would be justified that the amendment is invalid without their consent.

Id. cmt. f, illus. 7.

¶ 95. In addition, the Restatement concludes that "[u]nanimous consent is required for amendments that deprive individual owners of significant property or civil rights." Id. cmt. g. The commentary notes:

> With the advent of common-interest communities that involve higher-density development and greater financial interdependence, the extent and nature of the regulations imposed on property owners has increased, and with that increase has come a corresponding increase in the need for protection against unfair changes the majority may attempt to impose. Modern declarations frequently require two-thirds or more to approve amendments. However, some interests are so important that they should be protected by a greater requirement.

Id. The Restatement offers an illustration of a duly enacted amendment banning all pets that has been approved by two-thirds of the voting interests in an association. Id. cmt. g, illus. 11. The Restatement opines that, notwithstanding the two-thirds vote, the amendment is invalid without

50

unanimous approval. Id. The commentary notes that its guidance is not intended to invalidate or override express provisions of the declaration, but instead provides "a rule of construction and default rule that requires strict and narrow construction of amendment powers to exclude the power to prohibit or materially restrict use of individual lots or units (other than nuisances and harmful uses) unless they are clearly included within the scope of the power granted." Id. cmt. g.

¶ 96. The critical question in such cases "is whether an ordinary purchaser of property in the particular common-interest community would understand that the amendment in question is included in the association's amendment power." Id. See, e.g., Constellation Condo. Ass'n v. Harrington, 467 So. 2d 378, 383 (Fla. Dist. Ct. App. 1985) (holding that age restriction recorded in condominium documents in effect when owners acquired condominium was effective, but amendment limiting number of days children under age twelve were permitted to reside in age-restricted condominium units could not be applied retroactively to owners who purchased before the amendment); Winston Towers 200 Ass'n v. Saverio, 360 So. 2d 470, 470-71 (Fla. Dist. Ct. App. 1978) (holding that amendment to ban pets not registered as of 1973 void as to owner who purchased in 1971 whose properly registered dog gave birth to pups in 1975).

¶ 97. The Vermont Common Interest Ownership Act (CIOA) reinforces this view. The statute authorizes amendment of the declarations of preexisting common interest ownership communities created before its effective date to achieve any result permitted by the Act, regardless of prior applicable law. 27A V.S.A. § 1-206. But the Official Comment emphasizes that:

> In considering the permissible amendments under Section 1-206, it is important to distinguish between the law governing the procedure for amending declarations, and the substance of the amendments themselves. An amendment to the declaration of a community created under "old" law, even if permissible under this Act, must nevertheless be adopted "in conformity with the procedures and requirements specified" by the original instruments, and in compliance with the old law.

Id. Official Comment 2. Moreover, the statute expressly prohibits, among other things, any partition or encumbrance of common elements, id. § 2-107(f); alteration of the allocation of a

51

limited common element without the consent of the unit owners whose units are affected, id. § 2-108(a); and increasing the number of units, changing the boundaries of any unit, changing the allocated interests of a unit, or changing the uses to which a unit is restricted, in the absence of unanimous consent of unit owners, id. § 2-117(d). This more fully developed statute establishing the authority, and limitations on the authority, of majorities and supermajorities within common interest ownership communities clearly provides that some declaration amendments are invalid even with the support of two-thirds of unit owners.

¶ 98.    Common sense likewise supports the conclusion that there are substantive limits on the amendments an Association can make to a common interest community's declaration, even with a two-thirds majority vote. A framework that would enforce any amendment to the declarations enacted by a two-thirds majority unless expressly prohibited by statute or the declarations would swallow the rest of the covenants in a declaration and render them a fiction. A buyer would be purchasing the right to occupy a unit subject to whatever regime a governing supermajority sought to enact on a given day. If the majority is right in its assertion that "all that was necessary for the Association to lawfully amend the Declaration was compliance with the amendment process outlined in the Declaration, namely, two-thirds approval from the voting shares," ante, ¶ 47, then all manner of declaration amendments, if supported by a sufficient number of unit owners, would be permissible, no matter how detrimental to property owners' rights and reasonable expectations under the declaration in effect when they purchased their property, and regardless of their conflict with the mutual covenants reflected therein. Under the majority's view, a duly enacted amendment to the declaration could: (1) reclassify garages as common elements so that any unit owner or their guests could use any available garage at any time and no unit owner could count on parking in a nearby garage space; (2) change the boundaries of individual units to include flooring, ceilings, walls and roofs, notwithstanding the definition of "unit" in effect when unit owners acquired their interests; (3) reclassify the air space outside of units to allow for the dormer expansions disapproved in the majority opinion; or (4) prohibit pets or children in the units.

52

In fact, if the majority's approach were correct, the Association could establish through a declaration amendment what this Court today holds it cannot through a bylaw—an access easement that materially burdens landowners beyond what was originally contemplated in the initial declaration. That makes no sense.

¶ 99. The majority's reliance on a passing remark by the California Supreme Court in Nahrstedt v. Lakeside Village Condominium Association, 878 P.2d 1275 (Cal. 1994) to support the notion that anyone who buys a unit in a common interest development accepts the risk of unlimited changes to the covenants pursuant to which they bought the unit is misplaced. See ante ¶ 31. The legal holding of Nahrstedt is clearly inapposite; it affirmed the enforceability of a pet restriction that was incorporated into the original declaration pursuant to which the owner acquired her interest. The central issue in the case involved the enforceability of a recorded use restriction. The case offered little insight into the question presented here: under what circumstances can an Association change the governing rules in the declaration, and thereby impact a unit owner's established property interests and expectations? Moreover, although the California Supreme Court acknowledged the risk inherent in participating in a common interest community, it also acknowledged that the actions of an owner's association must "represent good faith efforts to further the purposes of the common interest development, [be] consistent with the development's governing documents, and comply with public policy." Nahrstedt, 878 P.2d at 1282. The court recognized that under California law the terms of a declaration represent equitable servitudes that run with the land and inure to the benefit and burden of separate interests in the development. Id. at 1283. Nothing in Nahrstedt supports the broad proposition that any procedurally sound amendment of a declaration is fair game.

¶ 100. In sum, asserting that Watson bought his condominium knowing that his interests and obligations were subject to some regulation through the Association does little to answer a number of the questions presented in this case. If the declaration amendments in question— reclassifying roof structures from limited common elements to common elements and attics from

common elements to limited common elements—can be taken by two-thirds of the members, then the statement that he knew what he was getting into is apt. If they cannot, then the fact that he bought a condo governed by a declaration that was subject to the possibility of amendments doesn't change his rights, and the tautological statement that he assumed the risk of declaration amendments the Association was legally entitled to make is irrelevant. To properly evaluate Watson's claims, we must look beyond the fact that the declaration amendments were procedurally sound and examine the substance of those amendments to determine whether they could be undertaken without his consent under the declaration and Vermont law.

¶ 101. With this in mind, my second point is that the reclassification of roof structures from limited common elements appurtenant to individual units to common elements is not authorized without the consent of unit owners whose exclusive interest in the limited common element was eliminated by the amendment.[18] This conclusion flows from the nature of the limited

---

[18] For the purposes of this analysis only, I accept the dubitable premise, advocated by both parties and accepted by the majority, that in 2008 the Association was authorized to amend the declaration by a two-thirds vote of the members to reclassify roof structures as limited common elements subject to the exclusive access of individual unit owners. I cannot reconcile this collective shared assumption with the majority's conclusion that the expansion of dormers associated with individual units into air space that is a common element "results in a reallocation of that airspace from a common element to a part of a unit . . . and that reallocation requires a unanimous vote by the unit owners." Ante, ¶ 52. If unused air space outside the second story of a structure that constitutes a common element cannot be subsumed into a unit or appropriated as a limited common element for that unit's exclusive use without the unanimous approval of all unit owners, then it's hard to see how actual structures on the roof above a unit could be reclassified as limited common elements for the exclusive use of the owners of the individual units under those roof structures without the same unanimous vote. The original declaration specifically provides that the common elements "shall remain undivided and shall be devoted to the common use and enjoyment of all Unit Owners." The governing statute says the same. See 27 V.S.A. 1306(c) ("Common areas and facilities shall remain undivided."). See also Cusimano v. Port Esplanade Condo. Ass'n, Inc., 55 So. 3d 931, 937-38 (La. Ct. App. 2011) (explaining that purported reclassification of pool and passageways from common elements to limited common elements improperly deprived co-owners in common of their use of the common elements without their consent); 27A V.S.A. § 2-108(c) (providing under CIOA that a general common element may be allocated as a limited common element only when the underlying declaration indicates that identified common elements may be reallocated as limited common elements). For this reason, the majority's ultimate conclusion concerning the roof structures may in fact be right, but for completely different reasons than those articulated by the majority. I seriously question whether the allocation of the roof structures as limited common elements—the allocation Watson seeks to maintain—was valid. In any event, as noted above, the focus of my dissenting analysis is the

common element of roof structures as a substantial appurtenance with a material impact on the use of the unit and is consistent with the CIOA. To the extent the majority addresses this question by concluding that covenants reflected in a declaration do not bind the Association, its analysis misses the mark and opens the door to incongruous consequences that I hope the majority would likewise find unacceptable.

¶ 102. The 2010 declaration amendment reclassifying roof structures as common elements, thereby eliminating Watson's exclusive use of the roof structures over his unit, materially restricted his use of his unit and could not be effective without his consent. An owner's consent is required for declaration amendments that materially restrict the owner's use of an individually owned unit. Restatement (Third) or Prop.: Servitudes § 6.10 cmt. g. The limited common element of roof structures is a substantial benefit appurtenant to unit ownership. The declaration makes clear that limited common elements are allocated for the <u>exclusive</u> use of one or more but fewer than all of the units. This right to exclusive use is appurtenant to a unit owner's property interest and is conveyed with the unit. See, e.g., <u>Juno by the Sea N. Condo. Ass'n v. Manfredonia</u>, 397 So. 2d 297, 300 (Fla. Dist. Ct. App. 1980) (noting that under Florida law limited common elements are reserved for the use of a certain unit and "become an appurtenance of the unit and pass with the unit when legal title is conveyed"). Watson's property interest in his unit includes the appurtenant limited common element of the roof structure.

¶ 103. Not only is the limited common element here a component of Watson's property right in his unit, but it is a material benefit. As the dispute in this case illustrates, exclusive access to and use of the roof structures affords unit owners the opportunity to place over-the-air reception devices on the roof—a use that is inconsistent with classification of roof structures as common elements. Regardless of whether the current unit owners in the community like roof-mounted

majority's conclusion that, assuming the operative declaration properly designated roof structures as limited common elements, the Association could re-designate those structures as common elements without the consent of the unit owners who thereby lost their exclusive use of the structures.

reception devices, in the absence of any restrictions on such uses at the time he acquired the limited common element, Watson could reasonably rely on the limited common element to support his mounting such devices. The Association's effort to take away from Watson and other unit owners their exclusive use of this limited common element required the consent of the affected unit owners, including Watson. See 2 G. A. Poliakoff, Law of Condominium Operations § 11:12 (2017) ("The original allocation [of limited common elements] may not be altered without the consent of the unit owners whose units are affected."); 15B Am. Jur. 2d Condominiums & Cooperative Apartments § 27 (2d ed. 2017) ("An allocation [of limited common elements] may not be altered without the consent of the unit owners whose units are affected.")

¶ 104. This conclusion is consistent with the express terms of the CIOA, which provides that the allocation of a limited common element "may not be altered without the consent of the unit owners whose units are affected." 27A V.S.A. § 2-108(a). Although the CIOA did not apply to this community at the time of the 2011 declaration amendment, its provisions are instructive. The Uniform Common Interest Ownership Act, which is the basis for the CIOA, brought together earlier strands of law governing common interest communities. See Restatement, (Third) of Prop.: Servitudes ch. 6, intro. note. It is far more robust and comprehensive than its predecessor, the COA. 27 V.S.A. §§ 1301-1329. Many issues addressed in the CIOA, such as the parameters for reallocating limited common elements, or even the existence and definition of limited common elements in the first place, are unaddressed in the COA. Accordingly, the fact that the Legislature has specifically provided in the CIOA that the allocation of limited common elements may not be altered without the consent of the affected unit owners does not suggest that prior Vermont law provided otherwise. The inclusion of this limitation in the CIOA reflects a persuasive legislative judgment that the best way to reconcile the potentially conflicting servitudes comprising the declaration—those authorizing revisions to the declaration itself and those establishing certain rights and obligations running with the property and relied upon by property owners—is to prohibit

56

amendments that dispossess owners of their established interests in limited common elements without their consent.

¶ 105. The majority's conclusion that the servitudes giving rise to a common interest community do not bind the Association, ante ¶ 33, fails to recognize the role these servitudes play in both protecting and restricting the ability of homeowners to act through their association. This court has recognized that common interest communities rely on reciprocal servitudes for their creation. See Khan v. Alpine Haven Prop. Owners' Ass'n, 2016 VT 101, ¶ 30, __ Vt. __, 153 A.3d 1218 (citing Restatement (Third) of Prop.: Servitudes, ch. 6, intro. note). Asking whether such servitudes bind the Association itself, see ante, ¶ 33, is the wrong formulation of the question. As the majority recognizes, deed covenants control the rights and obligations of common scheme participants, ante, ¶ 32. Of course they bind the Association, which is nothing more than the mechanism through which the members of the common interest community govern themselves. The suggestion that homeowners' associations are not limited by the covenants that define a common interest community, and underlie their very creation, is wrong and dangerous. It's like arguing that the U.S. Constitution does not bind Congress. The right way to understand the question in this case is: "How do we interpret and apply these covenants when on the one hand they assign unit owners certain rights—in this case limited common elements appurtenant to their units—but on the other hand they purport to allow amendment of the governing declaration, and the mutual covenants that it represents, by a two-thirds majority?" For the reasons set forth above, the provision authorizing amendment of the declaration does not create authority to remove from unit owners their interest in limited common elements without their consent.

¶ 106. As noted above, the implications of the majority's analysis of this question extend far beyond roof structures. If the majority's analysis were correct, with a two-thirds vote, the Association could reclassify every other limited common element, rendering doorsteps, stoops, porches, decks, patios, exterior doors and windows, equipment storage areas, closets or other fixtures attached to or adjacent to a single unit, and garage spaces all common elements, subject

to the common use and enjoyment of all owners. No unit owner would be able to exclude other unit owners from their attached storage sheds, previous garage spaces, patios, or front stoops. In fact, given the majority's conclusion that the attic spaces were properly reclassified as limited common elements, and that unit owners may be permitted to expand their living space into the limited common element comprising the attic spaces, according to the majority's view a supermajority of the unit owners could convert those spaces back into common elements in which all unit owners have an undivided interest. In this scenario, all members of the community would be entitled to access those attic spaces, even though many open directly into other owners' units. The majority can't really intend to suggest that this is the case, but this conclusion naturally flows from its analysis of the roof structures issue.

¶ 107. Finally, for two reasons, I cannot join the majority's conclusion that the Association may authorize unit owners to break through the ceilings above their units and extend their living space into the attics above, now designated as limited common elements. For the reasons noted above, I have grave doubts about the Association's authority to reclassify the common element of attic space into a limited common element as it purported to do in the 2008 declaration. But even accepting the declaration reclassifying attic spaces as limited common elements, I do not believe the Association is empowered to authorize unit owners to eliminate the boundaries of their units to essentially convert those limited common elements into functional extensions of their units. The majority's conclusion to the contrary rests on fictions that are too far removed from reality.

¶ 108. The Association's position requires some imagination. The declaration defines units as comprising the space between the horizontal plane of the bottom surface of the plasterboard of the ceilings of the top floor of the unit, and the horizontal plane of the top surface of the subflooring on the first floor. The rationale for allowing expansions into units' attic spaces is that the plane that defines the invisible ceiling that is removed to allow for access to the attic space remains in place even when it is gone. And even though unit owners may improve the attic space, inhabit it as an extension of their living space, and pass seamlessly through the invisible

58

boundary between their unit and the attic space, the attic space is not in fact part of their unit but remains a limited common element, like a porch or deck. This is too much of a fiction to sustain. See Sisto v. Am. Condo. Ass'n, 68 A.3d 603, 613-14 (R.I. 2013) (concluding that declarations of common interest community cannot avoid the applicable statutory requirements by characterizing expansion of condominium units as limited common elements). Although it is not clear why Watson opposes the action (since he himself benefits), he is right that, notwithstanding the labels assigned, in reality the Association is purporting to authorize unit owners to expand the boundaries of their units into limited common areas.

¶ 109. The good news is that now that Northshore is subject to the CIOA, the Association can accomplish through a straightforward legal mechanism what it has tried to do through an untenable fiction. The CIOA sets forth a process by which boundaries between units and common elements may be relocated to incorporate common elements within a unit. See 27A V.S.A. § 2-112. This would be the proper mechanism for the Association to invoke.

¶ 110. For the above reasons, with respect to the above matters, I respectfully dissent. I join the majority's analysis regarding those issues not addressed in this dissent.

¶ 111. I am authorized to state that Justice Skoglund joins this dissent.

_____
Associate Justice